## IN THE MATTER OF ELMER RUSSELL BEVINS, AN ATTORNEY AT LAW.

### No. 1331.

### ORIGINAL.

TRIED AUGUST 8-11; 14-18; 21-24, 1922.     DECIDED SEPTEMBER 14, 1922.

EDINGS AND PERRY, JJ., AND CIRCUIT JUDGE BANKS IN PLACE OF PETERS, C. J., DISQUALIFIED.

ATTORNEY AND CLIENT—*suspension and disbarment*—misconduct in capacity of county attorney.

An attorney is no less liable to disbarment or suspension for misconduct because it occurs in his administration of the office of county attorney or because impeachment proceedings lie against him for removal from office.

SAME—*same—not punishment but protection to community.*

Disbarment and suspension of an attorney are intended, not as punishment to the offending attorney, but as protection to the community in which he is licensed to practice.

SAME—*same—efforts to prejudice grand jury.*

A county attorney who, in the presence and hearing of the grand jurors assembled in court to receive instructions concerning a criminal prosecution about to be instituted by the attorney general of the Territory or one of his deputies, makes an address attacking the course of the attorney general or his deputy in instituting such proceedings without consulting him (the county attorney) and does so for the purpose of influencing the grand jury to refuse to indict the person about to be accused of crime, is guilty of infidelity to his clients, the county and its people, and violates his duty as county attorney and his duty as an attorney at law.

SAME—*same—advising defendant in a criminal case.*

A county attorney who, when informed by a defendant about to go to trial upon an indictment that he is ready to plead guilty and to tell the court the whole truth as he knows it, advises such defendant to plead not guilty and to "fight the case" and says to the defendant that the attorney general or his deputy who is conducting the prosecution will make every effort to

Opinion of the Court.

secure a conviction, is guilty of infidelity to his clients and violates his duty as county attorney and as an attorney at law.

SAME—*same—accepting employment in violation of R. L., Sec. 1431.*

A county attorney who accepts employment as counsel, and a retainer, from a plaintiff in a civil action depending upon the same state of facts constituting a *prima facie* case of the offense of gross cheat against the defendant in the action, violates R. L., Sec. 1915, and his duty as county attorney and as an attorney at law and is guilty of infidelity to his clients.

SAME—*same—continuing to serve a defendant informally accused by the other side of perjury.*

An attorney may properly continue until final judgment to act in an action of ejectment in behalf of a defendant who insists, in his dealings with the attorney, upon the truth of his (the client's) statements and evidence concerning his understanding of a certain interview and transaction, even though citizens of high reputation in the community have testified to a diametrically opposite uderstanding of the same interview and transaction.

SAME—*same—entering nolle prosequi.*

A county attorney may, without any violation of duty, enter a *nolle prosequi* in a case in which the defendant is charged with malicious injury, if the attorney believes that the alleged destruction of property was an act done in the fair assertion in good faith of a supposed legal right.

OPINION OF THE COURT, BY PERRY, J.

(Edings, J., dissenting.)

This is an information by the attorney general of the Territory of Hawaii alleging misconduct on the part of E. R. Bevins, an attorney licensed to practice in all of the courts of the Territory and praying for his disbarment. The information sets forth six charges which will be herein considered separately.

*First charge.* In an action of ejectment brought in the circuit court of the second judicial circuit by one Ambrose against one Kealakaa a document, reading as follows, was filed under the title of the court and cause:

"STIPULATION AND DISCONTINUANCE.

"It is hereby stipulated and agreed by and between the parties to the above entitled action that the said defendant, Kealakāa, shall 'and does hereby disclaim and surrender to the said plaintiff, J. W. Ambrose, all claim of title to the land and premises situate at Lahaina, Island of Maui, described in the complaint filed herein, being a portion of the land described in R. P. 1702, L. C. A. 3834, containing an area of 25/100 of an acre more or less.

"And in consideration whereof the said plaintiff, J. W. Ambrose, does hereby discontinue further proceedings in said cause, he (plaintiff) to pay all costs of court incurred herein and waives all claim of damages against the said Kealakaa which he may have in the premises.

"Dated at Wailuku, Maui, October 25, 1916.

"(Sig.) J. W. Ambrose.

"Homes & Olson
    "By (Sig.) W. O. Smith
        Attorneys for plaintiff.

    "(Sig.) Eugene Murphy
        Attorney for defendant."

At that time Mr. Eugene Murphy was sole attorney for the defendant in that action. Subsequently Kealakaa filed in the cause a motion to set aside this so-called "Stipulation and Discontinuance" upon the ground that it was not signed by movant nor assented to by him; that it was entered into without the knowledge or consent of the movant; that it was not explained to him until long after the same was signed and filed by Murphy; and that Murphy was not authorized by the movant to enter into the stipulation and agreement.

In support of this motion there was filed an affidavit by Kealakaa and a separate affidavit by one Joseph Kekoa, that of Kealakaa being to the general effect that

he still believed that he was the owner of the property involved in the action of ejectment; that he had at no time waived or surrendered his rights in the property or authorized Murphy to do so; and that while there was some talk in his presence on the occasion when the stipulation or agreement was claimed to have been arrived at, nevertheless he (Kealakaa) did not understand, and did not have explained to him, the true purport of the stipulation or agreement and that the same was signed and filed wholly without knowledge on his part of its substance or effect.

In the preparation of this motion and these affidavits the respondent, E. R. Bevins, served as the attorney and adviser of Kealakaa. The respondent served in the same capacity in all later stages of the action. Upon the hearing of the motion to set aside, the testimony not only of Kealakaa and Kekoa but of several other witnesses was taken. Among these others were the Honorable W. O. Smith, long a prominent member of the bar of this court, and Mr. S. K. Kamaiopili, a minister of the gospel. To Mr. Kamaiopili the Hawaiian language is the language of his birth. Mr. Smith, as it appears from the record, is perfectly familiar with the Hawaiian language. The testimony of these two witnesses was to the general effect that prior to the preparation of the "Stipulation and Discontinuance" its subject-matter was fully discussed with and explained to Kealakaa in the Hawaiian language and that he was familiar with its contents and authorized a waiver of his rights in the manner set forth in the document. The evidence of Kealakaa, and perhaps also that of Kekoa, was to the effect that no such explanation was made to Kealakaa and that he did not understand that he was entering into any agreement constituting a waiver of his rights in the land involved in the action and further to the effect that he at no time

authorized any such waiver or surrender either by his attorney or by any one else.

The circuit judge who presided at the hearing denied the motion. Shortly thereafter Ambrose instituted a second action of ejectment to try the title to the same real estate (upon the theory, doubtless, that the discontinuance of the first action did not bar the plaintiff from commencing a second action for the same cause). Kealakaa defended the second action, with the respondent acting as his attorney. When the second case came to trial the plaintiff objected to the admission of any evidence offered by Kealakaa tending to prove adverse possession accruing prior to the date of the "Stipulation and Discontinuance" and the court sustained the objection and excluded all evidence of this nature offered by Kealakaa. The theory of the objection and of the ruling was that the filing of the "Stipulation and Discontinuance" and the rendition of the decision upon the motion to set the same aside constituted a bar against any claim by Kealakaa of title to the land accruing prior to their date. Reviewing that ruling upon writ of error this court (*Ambrose* v. *Kealakaa,* 26 Haw. 412) held that neither the filing of the "Stipulation and Discontinuance" nor the decision upon the motion to set aside the same constituted such a bar, and further that "it is at least open to Kealakaa to claim, and to adduce proof in support of that claim, that the execution of the document was without his authority and without his knowledge" and that "the question of authorization should be left to the jury for it to determine upon the evidence adduced by both parties."

Three subdivisions or specifications are presented by the attorney general under the first charge, namely, (a) that it was the respondent's duty as county attorney to prosecute Kealakaa for perjury committed in his affidavit

and in his testimony in support of the motion to set aside and that this duty was not performed; (b) that the respondent, well knowing that Kealakaa had committed perjury in the respects just mentioned, continued to serve as his attorney in subsequent stages of the two actions of ejectment; and (c) that when the attorney general of the Territory, or his deputy, was seeking to secure an indictment of Kealakaa for perjury the respondent voluntarily appeared before the grand jury and made an effort to prevent the finding of a true bill.

The respondent has testified in the case at bar that he did not at any time know, and does not now know, that Kealakaa committed perjury. If Kealakaa came to the respondent and employed him as successor to Murphy, as he did, and if in so doing he asserted to the respondent his ignorance of the essence of the transaction as set forth in the "Stipulation and Discontinuance" and expressed a desire to have his claim to the land asserted and protected the respondent is not to be condemned for presenting his client's evidence to the court and for seeking an adjudication upon his client's claims as to his understanding, or failure of understanding, relating to the transaction in question. Without detracting in the least from the integrity and the veracity of Mr. Smith and Mr. Kamaiopili, it cannot be held as a matter of law that the mere fact that their testimony was entirely at variance with that given by Kealakaa would give the respondent knowledge that perjury had been committed by Kealakaa. The question at issue between these two witnesses, on the one hand, and Kealakaa, on the other, was largely one as to what Kealakaa understood, or did not understand, in the interview had with him by the two witnesses. It cannot be said as a matter of law that the understanding of the two witnesses necessarily excludes the possibility that Kealakaa in reality did not

understand the transaction as they did. As already held by this court in the second action of ejectment above referred to, Kealakaa is even now entitled to a hearing before a jury on the issue of whether or not he did understand the essence of the transaction as it was testified to by Mr. Smith and Mr. Kamaiopili.

It is indeed regrettable that the law as it stands at present permits a county attorney to attend to civil business other than that of his every-day clients, the community and the county which he represents. This very Kealakaa case constitutes an illustration of the evils and embarrassments permitted by the existing system. If the respondent, as county attorney, had not served as attorney for Kealakaa in these civil suits, he might conceivably have deemed it to be his duty upon the very same state of the evidence to institute criminal proceedings for perjury against Kealakaa. He accepted employment from Kealakaa under circumstances and at a time when such acceptance was not in violation of any statutory duty of his. The mere action of ejectment, when he accepted employment under it, did not arise out of any state of facts upon which it was the county attorney's duty to act in criminal proceedings on behalf of the county; and yet, having properly accepted the employment, he perhaps became disabled, by reason of that very employment and of the point of view it gave him with reference to Kealakaa's statements and claims and of the duties which it devolved upon him as attorney for Kealakaa, from viewing the evidence of Kealakaa in the same light as a wholly disinterested county attorney might have viewed it. The law, however, permitted him to accept the employment which he did and if by reason of that employment or for other reasons he in good faith regarded the evidence of Kealakaa as true or was unable to determine for himself that it was untrue, he cannot be condemned

for not instituting a criminal proceeding against him or for continuing to serve as his attorney in presenting his claims to the court.

As to the third specification the evidence adduced before us shows that the essential facts are not as set forth in the charge. The evidence is clear and undisputed. It shows that the respondent did not volunteer to go before the grand jury which was investigating the matter of the alleged perjury by Kealakaa but went there simply because he was summoned by the grand jury. Having appeared in response to the summons the grand jury caused him to be sworn as a witness and under oath he was asked a number of questions by the grand jury concerning his knowledge of the alleged perjury. His evidence, it is true, tended to support a finding that Kealakaa had not in the affidavit or in his testimony committed perjury; but if the respondent testified to the truth as he knew it (he says that he did and we find nothing in the evidence to contradict him) he did not violate any professional duty in so testifying. The respondent also stated his opinion to the grand jury, while under oath as a witness, that Kealakaa was not guilty of perjury, but it was given in response to a direct request from the grand jury that he state his opinion. If the respondent's evidence and statement before the grand jury did aid the grand jury in arriving at the conclusion that a true bill could not be found he is, nevertheless, not to be found fault with for that result. He was merely answering the questions and furnishing the opinion which the grand jurors themselves asked him for. It is to be noted, moreover, that the foreman of the grand jury testified in the case at bar that the grand jurors immediately prior to the calling of the respondent as a witness, and after hearing all of the testimony which the attorney general had presented, were inclining strongly towards refusing

to find a true bill and that this was due to the personal knowledge which some of the grand jurors, who lived in the same vicinity with Kealakaa, had of him and to the good reputation which Kealakaa had always borne in the community in which he lived.

*Second Charge.* This charge is that in violation of his duty the respondent entered a *nolle prosequi* in a criminal case in which Kealakaa was charged with malicious injury. The offense as charged consisted in the tearing down by Kealakaa of a fence which Ambrose had erected upon what he (Ambrose) deemed to be the boundary between his land and the land of Kealakaa. It appears from the evidence that this was the third time that Kealakaa had torn down a fence erected by Ambrose substantially upon this same alleged boundary. Ambrose's own evidence before this court is that Kealakaa told him that he had torn down the fence because it was not on the boundary and excluded him (Kealakaa) from the possession of land which was his. This tearing down of the fence was but an incident in the long-continued controversy and litigation between Ambrose and Kealakaa over the piece of land already referred to. The respondent has testified that the *nolle prosequi* was entered because he regarded the controversy over the fence and boundary as a proper subject for a civil suit and as not being a proper subject of criminal proceedings. The statute (R. L. 1915, Sec. 4026) says that: "An act done in the fair exercise, assertion or vindication in good faith of a supposed legal right, shall not be punishable as malicious injury." It would seem from all the evidence before us that the act of Kealakaa in tearing down the fence was an act done in the fair assertion, in good faith, of a supposed legal right. In any event there was ample support for the view on the part of the respondent that this was the case. His error, if there was any, was a mere

error of judgment and not a cause for disbarment or other similar procedure.

*Fifth charge.* This charge is that the respondent presented to the supervisors of the County of Maui, for allowance and payment by the county, a claim for attorney's fees and other expenses contrary to section 1584, R. L. 1915. In the course of the preliminary hearings of a certain criminal case the respondent, in consequence of certain statements made by him to the circuit judge while the court was in session, was by that court adjudged guilty of contempt of court and sentenced accordingly and an order was further issued against him by the same judge debarring him from the right to practice in that court as county attorney or as attorney for any client other than the County of Maui. Upon the rendition of this judgment the chairman of the board of supervisors of the County of Maui and one other supervisor expressed the view to the respondent that since the proceedings in question had taken place in the course of the respondent's employment as county attorney and that since the result of the proceedings was to prevent the respondent from serving as attorney for the County of Maui, that county should bear all expenses incurred in an effort to be made to set aside the judgment and order of the circuit judge and directed or encouraged the respondent to proceed at once to Honolulu to employ counsel to take such steps as might be necessary to secure a reversal of the order of contempt and disbarment, if it may be called that. Following these interviews with the supervisors the respondent proceeded to Honolulu, employed counsel and with the aid and the efforts of such counsel succeeded in having the order and judgment of the circuit judge of Maui set aside on the ground of invalidity. A bill (or bills) for the services of the attorneys of the respondent in this connection was sent to the

supervisors of the County of Maui and by them ordered to be paid. The voucher (or vouchers) contained a certificate signed by the respondent to the effect that the services referred to upon the face of the voucher had been faithfully performed. The other expenditures referred to in this charge were those incurred by the respondent for traveling expenses and hotel bills in connection with the proceedings in Honolulu by way of attack upon the order and judgment of the judge on Maui. Section 1584 reads as follows: "The county attorney, except for his own service, shall not present any claim, account or demand for allowance against the county." Contrary to the allegations of this charge the undisputed evidence in the case at bar is that the attorneys of the respondent in the proceedings in question themselves presented direct to the supervisors of the County of Maui their claim for professional services rendered and that the respondent took no part whatever in the presentation of that claim other than to certify that the services had been rendered. This certificate clearly is not in violation of the law. In the matter of these claims the respondent did not in any wise violate the law or any duty of his.

*Third charge.* R. L. 1915, Section 1431, relating to the attorney general, reads as follows: "He shall not receive any fee or reward from or in behalf of any person or prosecutor, for services rendered in any prosecution or business to which it shall be his official duty to attend; nor be concerned as counsel or attorney for either party in any civil action depending upon the same state of facts." This charge is that the respondent violated this statute by accepting employment and a retainer from one Manuel Botelho to conduct certain proceedings against one Thomas Brown in connection with an alleged fraudulent sale of land by Brown to Botelho.

It is obvious that the provision of R. L. section 1585,

making each county attorney a deputy of the attorney general, vests each such deputy with all of the powers of the attorney general but subject always to all of the same limitations and restrictions applicable to the attorney general; and that therefore the inhibitions of section 1431 apply to county attorneys. No contention is in this case advanced to the contrary.

As attorney for Botelho the respondent instituted a suit in equity in which Botelho was complainant and Thomas Brown and five of his brothers and sisters and their respective wives and husbands were respondents. The bill of complaint in that suit read as follows:

"Comes now Manuel Boteilho of Wailuku, County of Maui, Territory of Hawaii, and complains of the Respondents above named, and for his cause of action alleges:

"*First:* That your Petitioner, Manuel Boteilho, is an aged and ignorant person, unable to read or write the English language, and only able to speak and understand the simplest and most elementary parts of the English language.

"*Second:* That shortly prior to the 21st day of June, 1916, Respondent Thomas Brown, at Wailuku, in the County of Maui, Territory of Hawaii, approached your Petitioner and informed your Petitioner that he, said Respondent Thomas Brown, together with the other Respondents, Malie Brown, his wife, Joseph Brown and Mary Rose Brown, his wife; Charles Brown and Maria Brown, his wife; James Brown and Sarah Brown, his wife, Mary B. Naone, Eliza Akana and J. H. Akana, her husband, were the owners of certain pieces or parcels of land at Ulupalakua, in the County of Maui, Territory of Hawaii, lying adjacent to each other, and comprising an entire tract of approximately 120 acres; and the said Respondent Thomas Brown solicited and urged your Petitioner to buy the said pieces or parcels of land from the said Respondents at a price of $750.00

"*Third:* That thereupon your Petitioner asked and requested the said Respondent Thomas Brown to show to your Petitioner the said land which the said Thomas

Brown claimed he and said Respondents owned, and that thereupon the said Respondent Thomas Brown took your Petitioner to Ulupalakua and showed to your Petitioner a tract of land comprising approximately 120 acres, and which the said Respondent Thomas Brown claimed and represented to your Petitioner as being the tract of land hereinabove referred to, and which the said Respondent Thomas Brown offered on behalf of himself and the said Respondents to sell to your Petitioner.

"*Fourth:*   That Respondent Sam Pupuhi, who, your Petitioner is informed and believed, is a professional searcher of titles, came to your Petitioner and claimed and represented to your Petitioner that the said Thomas Brown and other respondents, other than the said Sam Pupuhi, were the owners of the said tract of land at Ulupalakua which the said Respondent Thomas Brown had showed to your Petitioner as being the property which he, the said Respondent Thomas Brown, had urged your said Petitioner to buy as hereinabove set forth.

"*Fifth:*   That your Petitioner, believing the statements of the said Respondent Thomas Brown and the said Respondent Sam Pupuhi as to the ownership of the said property and as to identity of the property so claimed to be owned by the said Respondents, other than the said Sam Pupuhi, thereupon agreed with the said Respondent Thomas Brown to purchase from the said Respondents, other than the said Sam Pupuhi, the said property so claimed to be owned by the said Respondents, other than the said Sam Pupuhi, and did, on the 21st day of June, 1916, pay to the said Respondent Thomas Brown the sum of $200.00 in cash as part payment of the purchase price thereof.

"*Sixth:*   That the said Respondent Sam Pupuhi, being present at the time and place of the payment of the said sum of $200.00 to the said Respondent Thomas Brown, made and delivered to your Petitioner a receipt for the said $200.00 signing the same in the name of him, the said Respondent Sam Pupuhi, but your Petitioner, as a matter of fact, paid the said sum of $200.00 to the said Respondent Thomas Brown on account of said purchase price and agreed to and with the said Respondent Thomas

Brown and the said Respondent Sam Pupuhi to pay to the said Respondent Thomas Brown on the 25th day of July, 1916, the balance of the $750.00 as the purchase price for the said land hereinabove referred to as being offered for sale to your Petitioner by the said Respondents, other than the said Sam Pupuhi.

"*Seventh:* That on the 25th day of July, 1916, your Petitioner paid to the said Respondent Thomas Brown the balance of the said agreed purchase price of the said property so offered for sale by the said Respondent Thomas Brown, to-wit, the sum of $550.00; that the Respondent Sam Pupuhi, being present at the time and place of said payment of the sum of $550.00 to the said Respondent Thomas Brown, executed and delivered to your Petitioner a receipt for the said sum of $550.00, balance of said purchase price, signing the same in the name of him, the said Respondent Sam Pupuhi, but your Petitioner paid the said sum of $550.00 to the said Thomas Brown; that at the time of the payment of the said balance of said purchase price as hereinabove set forth, the Respondents, Thomas Brown and Sam Pupuhi, delivered to your Petitioner a deed of the said Respondents Thomas Brown and Malie Brown, his wife, a copy of which deed is hereto attached, marked 'Exhibit 1,' hereby referred to and made a part hereof; also deed from Respondents Joseph Brown and Mary Rose Brown, his wife, a copy of which deed is hereto attached, marked 'Exhibit 2,' hereby referred to and made a part hereof; also deed from Respondents Charles Brown and Maria Brown, his wife, copy of which deed is hereto attached, marked 'Exhibit 3,' hereby referred to and made a part hereof; also deed from Respondents James Brown and Sarah Brown, his wife, copy of which deed is hereto attached, marked 'Exhibit 4,' hereby referred to and made a part hereof; also deed from Respondent Mary B. Naone, copy of which deed is hereto attached, marked 'Exhibit 5,' hereby referred to and made a part hereof; also deed from Respondents Mary B. Naone, Eliza Akana and J. H. Akana, her husband, Joseph · Brown and Mary Rose Brown, his wife, Thomas Brown and Malie Brown, his wife, James Brown and Sarah Brown, his wife,

Charles Brown and Maria Brown, his wife, copy of which deed is hereto attached, marked 'Exhibit 6,' hereby referred to and made a part hereof.

"*Eighth:* That your Petitioner, being unable to read or understand the contents of the said deeds hereinabove referred to and marked 'Exhibits 1, 2, 3, 4, 5, and 6,' and being informed by the said Respondents Thomas Brown and Sam Pupuhi that the said deeds conveyed to your Petitioner the said tract of land hereinabove referred to as being offered for sale by the said Respondents and believing that the said deeds conveyed to your Petitioner the property shown to him, your Petitioner, by the said Respondent Thomas Brown, as being the property owned by the said Respondents, other than the said Sam Pupuhi, accepted said deeds and paid the said purchase price as hereinabove set forth to the said Respondent Thomas Brown.

"*Ninth:* That your Petitioner thereafter undertook to take into his possession the tract of land which he, your said Petitioner, understood and believed to have been purchased by your said Petitioner from the said Respondents, other than the said Sam Pupuhi, and which the said Respondent Thomas Brown represented to your Petitioner as being the property conveyed to your Petitioner by the said Respondents, other than the said Sam Pupuhi, but learned that the said Respondents had no interest whatsoever in or to any land which they, the said Respondents, other than the said Sam Pupuhi, purported to convey to your Petitioner; and learned that your Petitioner acquired by said conveyances no right, title, interest or claim whatsoever in or to the said land which the said Respondent Thomas Brown represented to your Petitioner as being the property conveyed by the said Respondents, other than the said Sam Pupuhi, to your Petitioner; and your Petitioner further learned that the said property is, and for a great many years past has been, the property of persons other than the said Respondents or any of them.

"*Tenth:* That upon your Petitioner learning that the said property was not the property of the said Respondents, other than the said Sam Pupuhi, and upon

his learning that he, your Petitioner, had acquired by
said conveyances no right, title or interest whatsoever
in or to the said property represented to your Petitioner
as being the property conveyed to him by the said con-
veyances, your Petitioner demanded of the said Respond-
ent Thomas Brown that he repay to your Petitioner the
amount of $750.00 so paid to him, the said Respondent
Thomas Brown, by your Petitioner, but that the said
Thomas Brown has failed, neglected and absolutely re-
fused to repay to your Petitioner the said sum of $750.00
by your Petitioner so paid to the said Respondent Thomas
Brown, or any part thereof.

"*Eleventh:* And your Petitioner alleges that the
said conveyances as hereinabove set forth and the said
representation so made by the said Respondent Thomas
Brown as to the ownership of the said property were
made in total and absolute mistake as to the ownership
of said property; that by reason of said mistake as to
the title and ownership of said property, all of which was
unknown to your Petitioner, your Petitioner has suffered
and sustained great and material financial loss and for
which he has no plain, speedy and adequate remedy at
law.

"*Twelfth:* And your Petitioner further alleges
that the said representations on the part of the said
Respondents hereinabove named as to the ownership of
the property and premises which the said Thomas Brown
and Sam Pupuhi represented to be the property of the
said Respondents, other than the said Sam Pupuhi, were
totally and absolutely fraudulent and untrue and were
made with intent and purpose of obtaining from your Pe-
titioner the amount of the said purchase price of said
property; that the said Respondents Thomas Brown and
Sam Pupuhi well knew that the said Respondents other
than the said Sam Pupuhi had no right, title, interest or
claim whatsoever in or to the said property claimed and
represented by the said Respondents as being the prop-
erty of the Respondents, other than the said Sam Pupuhi,
and well knew that by said conveyances hereinabove re-
ferred to no right, title, interest or claim whatsoever in
or to the said property was conveyed to or acquired by

your Petitioner, and that thereby your Petitioner was defrauded of the said sum of said purchase price, to-wit, $750.00; that thereby your Petitioner suffered great and material financial loss and damage for which he has no plain, speedy and adequate remedy at law.

"Your Petitioner therefore presents the matters and things herein alleged to this a Court of Equity where such matters and things are cognizable, and prays that the process of this Court may issue; that the said Respondents and each of them be cited to appear and answer the matters and things herein set forth; that a full hearing may be had hereon; that upon said hearing the said Respondents may be required to repay to your Petitioner the sum of $750.00 paid by your Petitioner to the Respondents as hereinabove set forth; that the purported conveyances hereinabove referred to may be declared cancelled and that this Honorable Court may make such order and decree in the premises as will, as near as may be, restore your Petitioner to the financial condition in which he was prior to the occurring of the matters and things herein set forth; that your Petitioner may have his costs herein expended and may have such other and further relief as may be meet and proper in the premises.

"Dated at Wailuku, Maui, Territory of Hawaii, this 19th day of September, 1917.

his<br>
(Sig.). Manuel Boteilho   X<br>
mark"

(Subscribed and sworn to before the respondent, E. R. Bevins, as notary public.)

Upon the facts alleged in this bill of complaint Thomas Brown was guilty of violating R. L. 1915, section 3988, which reads as follows: "Whoever shall designedly, by any false pretense, and with intent to defraud, obtain from another any money, goods, or other thing of value, is guilty of a gross cheat." Section 3993 provides that "Whoever is convicted of a gross cheat

shall be punished by imprisonment at hard labor not more than one year, or by a fine not exceeding one thousand dollars." It is contended by counsel for the respondent that a false representation that one holds the title to real estate is not a false pretense within the meaning of section 3988, the argument being that the false pretenses contemplated by the statute are merely those which are of the same nature as are the two examples given in the same section, to wit, "obtaining of money or other property from another under false pretense of being sent for the same by a friend or acquaintence of his" and "obtaining money by means of a letter fabricated in the name of another." That the two examples can be regarded as belonging to a particular class which would exclude a pretense relating to the title to real estate we are unable to understand. The two examples set forth in the statute are not of pretenses *in writing* (one of them is and the other is not). They are not of pretenses relating to the ownership of personalty alone. Each of the two examples seems to relate merely to some of the *means* or *methods* by which the money or other property of another is fraudulently secured rather than to the nature of the property with reference to which the false representation is made. Upon reason it seems to us that a false representation concerning the title to land is, within the contemplation of the statute, as much of a "false pretense" as any other fraudulent representation inducing the defrauded person to part with his money or other property. The description of the statute, "by *any* false pretense," is as broad as it could well be made. No reason appears from the face of the section for believing that after making this broad definition the legislature intended to cut down its effect so as to exclude representations relating to real estate. The two examples given not containing within themselves any indication

that the pretense is to be of one or two particular classes
and not of any other, either the section must be construed
as naming only two pretenses rendering the offender
guilty or as meaning that, as the wording is, "*any* pre-
tense" brings the offender within the prohibition of the
statute.    The latter, we think, is the correct view.

No case has been called to our attention by counsel
of a gross cheat statute elsewhere containing examples,
as does ours, nor have we been able to find any.    In the
following cases, however, under statutes similar to ours
in their broadness, false representations concerning title
to real estate were regarded as being within the meaning
of the statutes, although that was not the particular
point under consideration : *Miller* v. *The People,* 22 Colo.
530, 532, in which the representations were as to the
title to the land proposed to be sold and in which the
court said that "any pretense which deceives the person
defrauded is sufficient although it would not have de-
ceived a person of ordinary prudence;" *State* v. *Penley,*
27 Conn. 587, 590, in which the fact asserted by the pris-
oner was that he was owner of a farm in a neighboring
town and able to pay for twenty yokes of oxen and in
which the court said, "pretending to be the owner of
valuable property, in good pecuniary credit and condi-
tion, knowing the pretense to be false, and making it with
intent to defraud, and by means of it obtaining property
with like intent, has often been held a false pretense,
punishable under statutes like our own;" *Crawford* v.
*State,* 117 Ga. 247, 250, in which the court said that "the
sources of information as to title to land are generally
matters of record, and since a prudent man would not
ordinarily rely on oral statements in respect thereto, it
was at one time doubted whether obtaining money under
false pretenses could be a crime, where the fraudulent
representation was as to an interest in land" but that

it was, however, "settled law in this (that) state that such an act is a violation of the penal code;" and *State* v. *Hill,* 72 Me. 238, 242, 243, in which the court said that "when one obtains credit by falsely pretending that he is the owner of property which he does not own, the fraud consists, not in his misrepresenting his· intention to pay, but in misrepresenting his ability to pay" and that "his intentions are not important." See also *People* v. *Oscar,* 105 Mich. 704, 707, in which the court said: "The offense consists in obtaining property from another by false pretenses. The intent to defraud is the intent, by the use of such false means, to induce another to part with its possession and confide it to defendant, when he would not otherwise have done so." In other words, it is immaterial what the false means were. If they were knowingly false and were used to cause the other party to part with his property, when he would not otherwise have done so, the offense named in the statute has been committed.

Bearing in mind that the respondent is not to be condemned for a mere error of judgment as to what the law is, it is to be noted in this connection that this contention, based on the fact that the false pretense related to the title to real estate, is an argument presented by the respondent's counsel and is not testified to by the respondent as a view held by him at the time that he prepared the bill in equity. On the question of knowledge and intention and exercise of judgment this point must not be overlooked. The *respondent's* explanation on the witness stand of his decision to accept the employment at Botelho's hands was, not that the representations related to real estate and therefore were not within the statute, but that "a criminal state of facts did not exist" because Thomas Brown and his associates did own some undivided interests in the land which was the subject of

the transaction between the Browns and Botelho. For the purposes of this case it is immaterial whether the false pretense consisted in representing to Botelho that the proposed grantors owned the whole property, well knowing that they had no interest whatever in the property, or in making the same representation, well knowing that they owned only an undivided interest less than the whole. In either event it would be a false pretense within the meaning of the statute and if it was made with knowledge of its falsity and for the fraudulent purpose of inducing Botelho to part with his $750 it was a criminal offense prohibited by R. L. section 3988.

The evidence before us shows, *prima facie* at least, that the offense of gross cheat was committed. Botelho testified before the circuit court in the trial of law case No. 632 (brought by him against this respondent for recovery of the sum of $100 paid by him to respondent as a retainer and for expenses of suit) in relating the circumstances under which Thomas Brown induced him to buy the property for $750: "He told me that he had a piece of land in area about 120 acres and I asked him if it belonged to him and he said 'No, it was his and his brothers'.' He offered to sell me his share. I told him, 'No, it was a far place, I would buy the property if all the family would go into that and sell it all.' Then he said he would go and see the family and brothers and after eight days would come to me. He said, 'Botelho will you buy? Do you want to buy the property?' I asked him, 'Will all your family sell their shares?' and he said, 'Yes.' I said, 'All right, I will buy.' He said, 'Suppose you buy I will take you over to Ulupalakua and show you the place.' He took me up there, my brother-in-law, Sam Pupuhi, Kama and Brown himself. It is up there, and showed us a big piece of land."

The circuit judge, before whom the case of *Botelho*

v. *Bevins* (Law 632) was tried, found in effect that the representations were that Thomas Brown and associates owned the whole of the land in question and that the deeds proffered in effectuating the transaction purported to convey the whole of the property and further found that the respondent, at the time he accepted the employment, understood that fraud had been committed by Brown. This was in a case in which the respondent appeared and had and exercised the right of cross-examination and was in other respects fully heard.

The respondent himself has testified in the case at bar (Transcript, 418-420) as follows: "I believed at the time that Botelho spoke to me that he thought he had bought the entire hunderd and twenty acres because sometimes he said 120 acres and sometimes 138 acres. The Court: He referred in his talks to you to one whole piece of land which he had said had been pointed out to him? A. That he had had pointed out to him by the Browns. He did. Q. He thought he was buying the whole of it when he paid the $750, didn't he? A. I think so. Q. In other words, that was his statement to you, his claim to you? A. That is what I gathered from his claim to me. * * * Q. I am talking about the $750 in money, not any money paid to you. What was your belief at the time that he came to you with his claim? Was it that he had understood that he had bought the whole land of the people who signed and conveyed to him, the whole land, or was it something different? A. When he came to me it was his belief that he had bought the whole land * * *. Q. What was the theory upon which that complaint" (meaning the bill in equity) "was drawn? A. This complaint was drawn as Botelho expressed it; he had paid his money and did not get his land and he wanted his land or he wanted his money."

It is true that the false representation as described

in the information in this case was that the grantors owned the whole land; that the deeds conveyed the whole title; that the land was pointed out by Thomas Brown to Botelho on the ground; and that the land so pointed out "was nonexistent" and no such land as described in the deed existed;" whereas our finding is that there was reasonable cause to believe that the false representation consisted in representing that the grantors owned the whole land while the fact, and the grantors' knowledge thereof, was that they owned only 6/10 or some other undivided fractional interest less than the whole. This is not in this case a material variance. The respondent is not here charged with the crime of gross cheat or with making a false pretense. The charge is that in a matter in which it was his duty to protect the people of the County of Maui by criminal proceedings against Thomas Brown he accepted employment and a retainer from Botelho for civil proceedings. Whether the false pretense involved in the possible prosecution against Thomas Brown was that alleged in the information or was the somewhat similar one which we find more probable from the evidence, is not a matter of any particular consequence in determining the guilt or innocence of the respondent on the charge under which he is being tried. Without an amendment to the information, therefore, it is our view that a decision may be rendered, the respondent having had throughout the trial knowledge of the developments of the evidence and having been fully heard, in testimony and in argument, upon all of its details.

The respondent, while giving the testimony above quoted on the subject of what he at the time of instituting the equity suit believed to have been the fraud committed, nevertheless also testified in effect that after Botelho had made his statement of the facts to him, he, the respondent, had made a further investigation into the

facts, including an interview with Thomas Brown in which he learned that it was Brown's claim that the grantors in the deeds did own certain undivided interests in the land in question and that he (Thomas Brown) had not represented to Botelho that the Browns owned any more than those undivided interests. The respondent further testified in effect that Botelho understood at the time of the negotiations with Thomas Brown that the Browns owned only certain undivided interests and that by the sale and purchase he would acquire only those undivided interests. In other words, the contention set forth in this testimony is that there was actually no fraud by Thomas Brown and that the respondent so believed at the time that he prepared the bill in equity. We regret that we cannot place reliance upon this testimony. It is utterly at variance with the facts as stated by the respondent in the bill of complaint which he himself drew and which he advised his aged and ignorant client, Botelho, to sign and to swear to. In the effort, evidently, to explain his failure to prosecute Brown and his acceptance of the employment by Botelho in a civil suit depending upon the same state of facts he has given testimony which, if true, would render him guilty of what would be a more serious violation of duty than the acceptance of the employment contrary to the terms of the statute. We prefer to believe, and do believe, that the narrative of the facts as drawn by the respondent in the bill of complaint, correctly represents what he understood and believed at the time to be the facts. The narrative was drawn by him at a time when the information and facts were fresh in his mind. The bill of complaint was dated and sworn to on September 19, 1917, and its allegations related to events therein stated to have occurred in the months of June and July, 1916.

It is not for this court to now try the merits of the

charge of gross cheat against Thomas Brown; nor is
this respondent to be tried now with reference to his or
our knowledge or information of today concerning the
merits of that charge of gross cheat.  He is to be tried,
with reference to his acceptance of the employment
and retainer in question, solely upon the information,
knowledge and understanding which he had in the
matter of Botelho's charges against Brown at the time
when he was called upon by the circumstances to de-
cide whether to accept the employment or not.  He
testifies in the case at bar that at that time he considered
in his mind the possibility of a charge of gross cheat
against Brown and his duty with reference to section
1431, R. L. 1915, in the matter of the acceptance of the
employment tendered.  The extent of that knowledge, in-
formation and understanding is shown by the bill of
complaint which he drew as well as by other evidence in
this case.  Upon respondent's testimony he did not at
the time entertain the view that the gross cheat statute
did not cover the case because the misrepresentation was
one concerning the title to real estate.  That being so we
cannot regard the acceptance of the employment as hav-
ing been purely an error of judgment on his part as to
whether "a criminal state of facts," as he expresses it in
his testimony, existed.  His own words in the bill of
complaint are too overwhelmingly to the contrary to per-
mit of any such finding.  In paragraph "Twelfth" of the
bill he says on behalf of Bothelho that "the said represen-
tations on the part of the said respondents hereinabove
named as to the ownership of the property and premises,
which the said Thomas Brown and Sam Pupuhi repre-
sented to be the property of the said respondents * * *
were totally and absolutely fraudulent and untrue and
were made with the intent and purpose of obtaining from
your petitioner the amount of the said purchase price of

the said property." It is beyond our understanding how an attorney of even ordinary intelligence could make. this allegation and yet, having considered the precise point, have also felt that "a criminal state of facts did not ex- ist."

Respondent's counsel calls attention to the fact that in paragraph "Eleventh" of the bill the respondent made an allegation that the representations as to ownership of the property "were made in total and absolute mistake as to the ownership of the said property" and that this shows that the respondent could not at the time have believed that the representations were in fact fraudulent or untrue. Neither in the evidence before this court nor in the evidence then before the respondent is the slightest basis to be found for the allegation relating to mistake. The respondent in his testimony seeks to explain the in- clusion of these allegations of paragraphs "Eleventh" and "Twelfth" upon the theory that they were purely "formal" and were inserted merely to compel the Browns either to show that they had title, in which case Botelho would be satisfied, or to return the $750. The argument does not impress us favorably. The unfounded inclusion of para- graph "Eleventh" cannot lessen the clearness and direct- ness of the allegations of fact contained in paragraph "Twelfth." The allegations of paragraph "Twelfth" are not "formal." If they are made in bills of complaint in equity suits it is because the facts justify them. No mere necessity, no mere desire for a favorable judgment, no mere considerations of expediency would have justi- fied such allegations when they were not believed by the attorney preparing the bill to be true in fact.

*Fourth charge.* This is a charge that in violation of his duty as county attorney of Maui the respondent failed to prosecute one Waiwaiole, who, while acting as deputy sheriff for the district of Hana in the County of

Maui, with other officers made a raid upon certain Japanese and arrested them upon a charge of violating the laws relating to gambling. In the raid he and his associates took from the Japanese a sum of money, variously stated in the evidence at amounts not exceeding $230. At the trial of the Japanese upon the charge of gambling before the district magistrate of Hana the money, although on the prosecuting officer's table in the court room, was not introduced in evidence, and whether for that reason or for some other reason the defendants were found by the magistrate not guilty and discharged. They subsequently asked for a return of the money but it was not at any time returned to them. The respondent brought to the attention of the grand jury, at one of its sessions, the matter charged against Waiwaiole and called as a witness the sheriff of the county, who had made some investigation into the matter and who thereupon made a statement to the grand jury of what he had learned in the course of his investigation. At the conclusion of this statement the respondent inquired of the grand jury whether it wanted any more evidence and was told that it did not. The grand jury presented a report recommending that "pending a full investigation of this matter" Waiwaiole be suspended from office. No further investigation was thereafter made by the respondent nor did he ask the sheriff or any one else to make such an investigation. He testifies that upon the presentation of the report of the grand jury, he considered the matter as closed. Another regular session of the grand jury having been held without action by the county attorney the attorney general at a special session of the grand jury presented a new charge against Waiwaiole and his associates and evidence in support of that charge. The grand jury found a true bill against Waiwaiole and five associates. (After trial, Waiwaiole and one other defend-

ant were convicted and Waiwaiole was sentenced to three months imprisonment and to pay a fine of $200 and the sentence was executed.) Shortly before the time appointed for the trial of these defendants upon this indictment Waiwaiole approached the county attorney, told him that he thought he would plead guilty and tell everything he knew to the court and asked the county attorney what he thought about it. The respondent then told him that he had better plead not guilty and fight the case and that he (the respondent) would do whatever he could for him.

There is in the testimony of the respondent in the case at bar that which was intended perhaps to be received as a denial of this evidence of Waiwaiole but it is not a direct denial and is unsatisfactory to us. His testimony is that he advised them to "go to some other lawyer and told them to get the best lawyer they could because I felt that they" (meaning the deputy attorney general) "would stick them if they possibly could." (Transcript, p. 457.) In this he referred to a conversation had shortly after the finding of an indictment and not to the time of the trial, which was several months later. His attention having been called specifically to the morning of the trial and to the conversation detailed by Waiwaiole in his evidence, the respondent said, "I have no recollection of any conversation with Waiwaiole on the morning the case went to trial. Q. Are you prepared to state whether you did or did not have such conversation? A. I don't believe I had any such conversation at that time. Q. Have you anything else to say now?" He answered by testifying to other matters. If the respondent's standards of ethics are entirely correct he should *know* that he gave no such advice to Waiwaiole and he should have been able to give the most positive, unqualified answers to the effect that he did not at any

time give Waiwaiole any such advice. We are not impressed by his answers on this subject.

The charge against Waiwaiole was presented to the grand jury by the respondent in a most superficial and incomplete manner—in the manner best calculated to bring from the grand jury a finding of "no bill." The matter has, as the court phrased it in the case of *Moanauli*, 7 Haw. 261, 262, "a bad appearance." The sheriff, who was the sole witness produced by the respondent, had no knowledge of his own which he could transmit to the grand jury. The witnesses who did possess the requisite knowledge were available at Hana, even though sixty miles away from the place of the session of the grand jury. A continuance could well have been had or at least requested for the presentation of further evidence. If this matter stood alone we could not upon the evidence make a finding that with reference to the presentation of the cause to the grand jury the respondent violated his duty; but the respondent's conduct, when applied to by Waiwaiole for advice at the time of the trial, as above stated, gives color to his preceding conduct and indicates his motives and clearly shows that the respondent was unfaithful to his clients, the county and the people of Maui, and rendered his assistance, such as it was, to the defendant in a criminal case and not to the prosecution.

*Sixth charge.* This contains four subdivisions or specifications. The first one is that the respondent acted on behalf of one Charles E. Thompson and demanded for him the return of three hides which the sheriff of Maui had seized and held in his possession and that he made this demand with the knowledge that Thompson had been guilty of larceny of cattle. The evidence does not sustain this charge as made. It was clearly to the effect that the respondent did not make any demand upon the sheriff

for a return of the hides but that he did advise Thompson to leave the hides with the sheriff. But we cannot by silence or otherwise approve of the county attorney's having acted in behalf of Thompson even to the extent that he did. The information conveyed to him by Thompson was that these three hides with a number of others had been forwarded by him (Thompson) from Kula or vicinity to Kahului for one Angus McPhee. It was obvious from what Thompson said to the respondent that Thompson claimed the hides either as being his own or as belonging to one to whom he had sold them or to whom he had contracted to sell them. The respondent was informed further that the sheriff had seized the hides. It was true that upon this information there was a possibility that the hides (three out of a large lot) had been taken in a civil suit by way of an attachment, but it was also possible, and far more probable, that they had been seized as evidence in a criminal case. A refusal at that time to have anything to do on behalf of Thompson in the matter of the hides would have left the county attorney more at liberty to take part in any criminal proceedings against Thompson and a strict regard for his duty would have led him to refuse to have anything to do with the matter. (Thompson was subsequently indicted for cattle stealing and was convicted by a jury, although the conviction was later set aside by this court, not upon the ground of insufficiency of evidence tending to prove his guilt but upon the sole ground that upon the same state of the evidence others charged with him in the indictment had been acquitted.)

It is to be noted in the respondent's behalf that the evidence before us is to the effect that he had not been informed, at the time that he called upon the sheriff with Thompson to inquire about the status of the hides, that Thompson was to be charged with cattle stealing

and that an investigation was being had in connection with the possible charge against Thompson for cattle stealing.

The second specification under this charge is that the respondent, as Thompson's attorney, aided the latter in procuring a license for the transaction of his business as a butcher and in doing so "ordered" the treasurer of the county to issue a license without the production of a certificate by Thompson that he had paid his taxes in full as required by law and at a time when, as was well known to the respondent, Thompson was in arrears in the payment of his taxes. There is no evidence to the effect that the respondent gave any such order. His own testimony and that of the county treasurer (there is none to the contrary) is that when the nonpayment of taxes was mentioned the treasurer asked the respondent whether it would be all right to issue the license at that time and that the respondent merely answered that he thought that it would be, believing that Thompson would very shortly thereafter pay his taxes. In doing this the county attorney encouraged the treasurer to issue a license in violation of law; but perhaps this is a comparatively small matter.

On the same day that the inquiry as to the hides was made and that the issuance of the butcher's license was obtained the respondent on behalf of Thompson wrote to the chairman of the territorial board of agriculture and forestry for a permit to Thompson to hunt wild cattle in the Kula forest reserve. (Thompson's slaughter-house is at Kamaole in the district of Kula.) These matters of the application for a butcher's license and for a hunting permit had been pending for some time (months perhaps). The charge is that in these three instances—inquiry as to the hides, application for a butcher's license and application for a permit to hunt—the respondent was

seeking to aid Thompson in his future defense of any charge of cattle stealing that might be brought against him. It may be that neither the license nor the permit would have been legally admissible in evidence on behalf of the defendant Thompson on the trial of a charge of that nature but it may also be that they were deemed by the respondent to be aids of some value in such defense. Upon all of the evidence before us it cannot be said that it has been proven that the respondent acted in these three matters, even though on the same day, for that purpose, although we must confess that the evidence does not leave us satisfied that that was not his purpose.

The fourth specification under the sixth charge is that in the presence of the court and of the grand jurors who were assembled to receive their instructions and to attend to such business as the attorney general of the Territory might personally present to them the respondent made the following speech: .

"If the Court please, before the Grand Jury retires I desire to make a statement. As you know, and as probably the members of the Grand Judy know, this town is rife with rumors as to the occasion for the presence of the Attorney General here on Maui. I will say that I have not been consulted or advised in any way, official or unofficial, of the occasion for the presence of the Attorney General of the Territory before this Grand Jury. Your Honor has said to the Grand Jury that the head of the legal department of the Territory is here to present certain matters to this Grand Jury. I most strenuously, as County Attorney of the County of Maui, object to the Attorney General of the Territory appearing before this Grand Jury, either in person or by any person whom he may specially deputize to appear before this Grand Jury. I will call your Honor's attention to the fact that the laws of the Territory of Hawaii make the County Attorney the public prosecutor for the County of Maui. My attitude in this is: If the Attorney General has anything to present to this Grand Jury, it should go

thru my office and not thru some outsider. I am informed,—as a matter of fact I know—that a member of the Bar of Wailuku, Mr. Enos Vincent, has represented to officials of the Police Department that he has been specially deputized to work up certain cases · here. I will say that even though Mr. Vincent has been specially deputized by the Attorney General that such special deputization gives him no standing before this Grand Jury. A year and a half ago some such situation took place in Wailuku. I stood all the butts and jokes at that time, and have been reelected as County Attorney of the County of Maui, and am here to conduct the affairs of the County according to law. I will not brook the interference of Mr. Irwin as Attorney General, or Mr. Enos Vincent as his special deputy, unless he comes before the Bar as Special County Attorney; and I think Mr. Irwin has acted wholly and absolutely outside the ethics of his profession in coming into the County of Maui and carrying on investigations without the help of my office. I further object to the appointment of Miss Dunn as a Special Court Stenographer to appear before the Grand Jury. The rule of Court, as I understand it, prescribes that an Official reporter of this Court shall go before the Grand Jury; and if anyone goes before the Grand Jury to take down the proceedings it should be Mr. McMahon, the Official Reporter of this Court."

The attorney general was present in person at that session of the court to present to the grand jury a charge against Thompson and others of cattle stealing and this was known to the respondent at the time that he made the speech above quoted. In words the speech stated a claim by the respondent that the attorney general of the Territory of Hawaii had not the power or the right to present criminal matters to the grand jury without the authority and the permission of the county attorney. It is argued by counsel for the respondent in the case at bar that such is the law. The contention, in our opinion, is utterly unfounded. Our statutes expressly provide that

"The attorney general shall appear for the Territory personally or by deputy in all the courts of record of this Territory, in all cases criminal or civil in which the Territory may be a party, or may be interested" (R. L., Sec. 1426) ; and that "He shall be vigilant and active in detecting offenders against the laws of the Territory, and shall prosecute the same with diligence" (R. L., Sec. 1427). This language is unambiguous. It is too clear to be misunderstood. The same duties devolve upon his deputies. Nor is there anything to the contrary in the legislation relating to the counties or to county attorneys. The provisions in R. L., section 1580, that "The county attorney is the public prosecutor for the county in which he shall have been elected" and that he or his deputy shall "attend the circuit court in and for said county and conduct on behalf of the people all prosecutions therein for offenses against the laws of the Territory of Hawaii and the ordinances of the board of supervisors of the county," do not make the county attorney the exclusive prosecutor in territorial matters. "Each county attorney when elected shall become a deputy of the attorney general of the Territory and shall report to the attorney general from time to time as he may be required" (R. L., Sec. 1585). Surely as a deputy of the attorney general he cannot be a superior of the latter. Section 71 of the Organic Act provides that "there shall be an attorney general who shall have the powers and duties of the attorney general," (as theretofore provided by Hawaiian law) "except as changed by this act and subject to modification by the legislature." In *Castle* v. *Secretary of the Territory,* 16 Haw. 769, 779, in which the validity of the County Act was under consideration, this court said: "Creating counties and providing for their government does not require and therefore does not imply the abrogation of the functions in respect of

territorial affairs of the territorial officers such as the attorney general and superintendent of public works. * * * The Organic Act places with the attorney general the duty of prosecuting violations of territorial penal laws and claims, together with many other duties imposed upon him by the laws of Hawaii, subject to such 'modification' as the legislature may by law enact. The provision that these duties 'are subject to modifications by the legislature' was not necessarily made solely with reference to the authority 'to create counties,' etc., but may appropriately relate as well to details making those duties more specific, or enlarging them but not substantially revoking them nor substituting for their performance another officer in place of the attorney general. The Territory as well as counties is concerned in the enforcement of territorial penal laws. * * * To place with county attorneys to the exclusion of the attorney general the duty of prosecuting them would not be a 'modification' of the attorney general's duties but practically a repeal of that portion of the Organic Act which relates to them. Violation of county ordinances and prosecution of county claims would properly be entrusted to county atorneys only, but that is the extent to which their exclusive authority can go without subverting the territorial system provided by Congress. Even if it were true that the Act in respect of the attorney general's functions or in some other respects goes further than is contemplated by the provisions of the Organic Act for county government, there is nothing therein which appears to us to invalidate the Act. The result would simply be that the attorney general would still be authorized to perform all of his functions as prescribed by the Organic Act as far as they concern territorial matters. This is perhaps the intent of the provision in the County Act which makes the county attorneys the deputies of

the attorney general." That reasoning appeals to us as being sound and applicable to the case at bar. To uphold the contention of the respondent's attorney would be to substitute each county attorney in his county for the attorney general in the whole scheme of government, as it existed immediately prior to the adoption of the Organic Act, in the prosecution of territorial laws as well as county ordinances. We find nothing in the statutes indicative of any such intention on the part of the local legislature, and, as held in the *Castle* case, if it was the intention it proved nugatory because in conflict with the provisions of the Organic Act.

If the respondent's language under consideration was merely the assertion of his views, made in good faith, why did he not present that claim to the attorney general or to the court or to both at a time and place when the grand jurors were not present? Something has been said in argument as to the possibility of his ignorance of the law and of correct procedure excusing some of his acts or omissions; but we cannot properly attribute to him so great a degree of lack of intelligence and understanding of the law and procedure and right action as to lead us to believe that in making the address in question he failed to realize that it might well have a tendency to prejudice the jury against bringing an indictment against Thompson. On the contrary, we cannot escape the conclusion, and it is our belief, that the language used was used for the definite purpose of prejudicing the grand jury and of leading the grand jurors to refuse to find a true bill against Thompson.

Respondent's counsel contends that these are matters which concerned the conduct of the respondent as county attorney and not as a member of the bar and that the proper remedy is by proceedings for impeachment and not by proceedings for disbarment. The law has been

settled to the contrary in this jurisdiction in the case of *Cooper,* 12 Haw. 124, 128, 129, where the court said: "No doubt a member of the bar may perform acts in some other official capacity or even in a private capacity of such disgraceful, immoral or criminal character as to show him to be unfit to continue longer a member of the profession, and for such conduct he may be held to account by the court even to the extent of disbarment." Proceedings for disbarment or suspension are intended, not as a punishment to the offending attorney, but as a protection to the community in which he practices. To merely remove him from office in impeachment proceedings does not secure such protection to private litigants. It affords protection to the county as such by removing one who is unworthy of that office, but in so far as that judgment or decree is concerned it does not disable him from practicing for individuals or other ordinary clients and does not sufficiently serve as notice to intending litigants or clients of the past record of the offender. It is plain that a prior proceeding for a judgment of impeachment would not be a bar to subsequent proceedings for disbarment or suspension. If this is so it clearly follows that the possibility of a future proceeding for impeachment cannot be a sufficient reason for not maintaining proceedings for the disbarment or suspension. The statute vests in this court the "sole power to revoke or suspend the license of any such practitioners" (at law) "or to dismiss or suspend them from the roll of practitioners for malpractice, fraud, deceit or other gross misconduct." (R. L., Sec. 2323, as amended by L. 1921, Act 81.) This power it is the duty of this court to exercise when misconduct on the part of an attorney is properly called to its attention. Other courts and writers have taken the same view:

"The court may suspend or disbar an attorney for

misconduct in connection with his duties as a prosecuting officer, and this is true although he is also subject to impeachment by the state. Thus, a prosecuting attorney may be disbarred for gross infidelity to his trust. So the refusal or neglect of a district attorney to prosecute persons charged with the commission of a crime will justify his disbarment. And where a prosecuting officer receives sums of money as a consideration for refraining from enforcing the penal laws of the State he will be disbarred." 2 Thornton, Attorneys at Law, Sec. 847.

"We cannot differentiate between his character of an attorney and that of such county official, as some argument advanced indicates should be done. Such public relation only aggravates the offense charged against him. The mere fact that he is liable to indictment for malfeasance in office and to removal therefrom does in no way affect the power and duty of the court to strike his name from the roll of attorneys for the same misconduct for which he could be also both indicted and removed. It is all the more reason why his name should be stricken from the roll that the misconduct which unfits him is a breach of fidelity to the public whose welfare he is sworn to maintain. Is not such infidelity even worse than breach of trust to a single client? No one will deny the power and duty of a court to strike from the roll the name of one who fails to maintain fidelity to the personal trust of a single client's interest. How much more important is the duty to exercise this power when the infidelity or misconduct relates to an attorney charged, not only by the honor and oath of an attorney at the bar, but also by the dignity and oath of a public official, in an office calling for the exercise of highest qualities as an attorney!" *State* v. *Hays,* 61 S. E. (W. Va.) 355, 356.

"The respondent and his counsel claimed before the commissioners and now contend that because the misconduct found relates to the Respondent's duties as State's Attorney for the county of Rutland, for which he is answerable to the voters of the county, and to the State, and for which he might be impeached, this court has no jurisdiction over him in regard to the same.

While acting in the county court in the prosecution of cases in which the State was a party, and in all his relations to parties, counsel and court, in such prosecutions, he was also acting in his official capacity as an attorney of this court, and under the obligations assumed by him when he became such attorney. Notwithstanding he might be liable to impeachment, or might be rejected by the voters, if a candidate for reelection, his conduct when acting in his office of attorney, and sometimes when acting in a private or other capacity, was open to investigation by this court, and if found to be such that the court, to protect itself and the public, and to keep the administration of justice pure, ought to withdraw the protection and credit under the law which it accorded him by admitting him to the office of an attorney at law and solicitor in chancery, it is, beyond question, the right and duty of this court to deal with him as justice demands. It may suspend or disbar him." *In re Joseph C. Jones,* 70 Vt. 71, 86.

"The fact that some of the acts charged against him were acts of official malfeasance committed in his capacity as county attorney can make no difference. He performed them as an attorney at law—as an official of the court as well as an officer of the county. While we have previously held that a county attorney need not be a duly admitted and licensed member of the bar * * * yet if he be such he must, in representing the interests of his *quasi*-corporate client, be governed by those rules of professional conduct under which justice must needs be administered to public as well as to private litigants." *In re Norris,* 60 Kans. 649, 659.

"He held the office of state's attorney by virtue of his having a license from this court to practice law and any deviation from the line of proper deportment in the office of state's attorney is equally a deviation from the line of proper deportment as an attorney at law. It cannot be successfully maintained that criminal conduct on his part as state's attorney cannot be used as evidence to take from him the authority under which he practices law, and under which he exercises the functions of state's attorney, whereas a person may commit some offense not connected with his duties as an attorney at law, when

such offenses do not unfit him for the practice of his profession and render him unworthy of the confidence of clients, and no ground exists for disbarring him. In such cases the man and the attorney at law are deemed separate, and an act that may reflect seriously upon the character of the man will not be grounds for disbarment or suspension. But it is not true that corrupt conduct on the part of a state's attorney in his professional capacity will not constitute cause for disbarment or suspension as an attorney and counsellor at law." *In re Voss,* 11 N. Dak. 540, 552.

Our findings under the third charge, relating to *Botelho* v. *Brown,* under the fourth charge, relating to Waiwaiole, and under the sixth charge, relating to the speech in the presence of the grand jury, are in effect that the respondent in each of these instances was guilty of infidelity to his client, the County of Maui. It was his duty in each of the cases mentioned to protect to the best of his ability the interests of his standing client, the county, and to do nothing in conflict with that duty. In attempting to prejudice the grand jury so as to cause it to fail to find a true bill against Thompson he violated his sworn duty. In advising Waiwaiole not to carry out his purpose of pleading guilty and of telling the whole truth to the court as he knew it, and in further advising him to fight the case because the attorney general's department would use every effort to "stick him," he violated his sworn duty. These were serious derelictions of duty, not to be lightly treated. The third instance likewise involved a violation of his statutory duty although possibly not so serious as in the other two cases. As already stated, it is not the purpose of the judgment in a proceeding for disbarment, where the respondent is found guilty, to punish him. The sole purpose is to protect those with whom he may come in contact as attorney and who may become his clients. It is difficult sometimes

to admeasure with exactness the result or sentence which should flow from the findings made. It is better to err on the side of leniency than on that of undue strictness. Utter disbarment under the facts of this case, we think, is not called for. The respondent is still a comparatively young man. Mere censure, on the other hand, would be inadequate, as it seems to us, to properly safeguard the interests of the public.

The judgment of the court is that the respondent be and he is hereby suspended from the practice of the law for the period of three months from this date and that his license to practice law be suspended for the said period of time.

*J. Lightfoot,* First Deputy Attorney General, and *Enos Vincent* for the prosecution.

*Smith & Wild* for respondent.

### DISSENTING OPINION OF EDINGS, J.

I am unable, from the evidence adduced in this case, to reach the conclusion arrived at by the majority of the court.

Certain portions of the opinion it will not be necessary to consider as they have not been adverse to the respondent.

*Third charge.* This charge in the information is in substance as follows: "Re Manuel Boteilho. Your informant is informed and believes and upon such information and belief alleges and avers that Manuel Boteilho is a Portuguese man of advanced years, residing at Wailuku, Island of Maui, who has acquired considerable savings from his labors, but who is unable to read or write the English, Portuguese or any language, and is of an ignorant but trustful nature;" that one Thomas Brown offered to sell to him (the said Botelho) for the sum of $750 a piece of land containing approximately 120

acres, situate at Ulupalakua, Maui, and he (the said Thomas Brown), together with one Samuel Pupuhi, took the said Manuel Botelho to Ulupalakua and pointed out to·him, a certain piece of land which the said Brown represented to him as the land which he proposed to sell to him (the said Botelho) for the sum of $750; that the said Botelho, believing the offer was a bargain, accepted the same and paid the sum of $750 to the said Brown, and thereafter received from said·Brown and others a deed pretending to convey to him (the said Manuel Botelho) the said piece or parcel of land; that said Brown at the time of the execution and delivery of the said pretended deed had no title to the said land and well knew that he had no title to the land pointed out to  the said Botelho as aforesaid for the reason that the said land was then, and for a long time had been, the property of the Raymond ranch.

This charge is absolutely unsupported by a scintilla of evidence.  The land in question is not, nor has it ever been at any time, the property of the Raymond ranch nor was there an iota of evidence introduced to support this allegation.  The evidence adduced established beyond the shadow of a doubt that the land pointed out to Botelho by Brown was the property of Brown and his brothers and sisters, and while it is true that the deed did not convey the entire interest of all of the children (the brothers and sisters of Brown), three of them not having signed the instrument, there is no question that the record and the testimony in this case show that the deed was a valid conveyance of the interest of Brown and his brothers and sisters, with the exception of the three before-mentioned, in and to the land pointed out to Botelho by Brown in the first instance; that even upon the construction placed upon the statute in regard to gross cheat by this court, with which I am not in accord, Brown was

not guilty of a criminal offense and it would appear that this was the view taken by the attorney general's department for it has never instituted any criminal proceedings against him. That Bevins alleged in his bill in equity, wherein he attempted to recover a perfect title from Brown, on the amount paid, for Botelho, that Brown had committed a fraud cannot, standing alone, metamorphose a transaction of this description into the statutory crime of gross cheat and it is not unreasonable to suppose that had the attorney general been fully informed of the circumstances of this charge, as developed by the testimony thereupon, the said charge would never have been made against Bevins.

This, in my judgment, being the only conclusion deducible from the evidence I fail to see how the respondent could have been guilty of a breach of section 1431, R. L. 1915, prohibiting the attorney general from receiving "any fee or reward from or in behalf of any person or prosecutor, for services rendered in any prosecution or business to which it shall be his official duty to attend; nor be concerned as counsel or attorney for either party to any civil action depending upon the same state of facts."

*Fourth charge.* This is a charge that in violation of his duty as county attorney of Maui the respondent failed to prosecute one Waiwaiole, who, while acting as deputy sheriff for the district of Hana, in the County of Maui, with other officers made a raid upon certain Japanese and arrested them upon a charge of violating the laws relating to gambling. In the raid he (the said Waiwaiole) and his associates took from the Japanese a sum of money and converted the same to their own use. It appears from the testimony that this matter was presented by Bevins to the grand jury who acted upon that presentation and recommended in its report that "pending

a final investigation of this matter Waiwaiole be suspended from office." The sheriff testifies that he was suspended and discharged from his office and that he concluded that that ended the matter so far as Waiwaiole was concerned. That Bevins did not bring the matter again to the grand jury at its next session is true, but the witnesses were all Japanese, unable to understand or speak the English language and residing in a remote district of the island, and it would have been almost impossible for either the sheriff or Bevins to have obtained the necessary evidence within that time. Afterwards the attorney general brought this matter of Waiwaiole and his associates before the grand jury upon evidence obtained from one Eugene Murphy, Esq., the attorney for these Japanese, who was possibly the only man on Maui that was in a position to obtain this testimony, the Japanese coming to him voluntarily as their attorney and making their statements in regard to the matter; and this is the entire substance of this charge. If there was testimony upon this hearing in regard to other matters which appear to have influenced the opinion of the majority of this court this evidence was clearly inadmissible and should have been rejected as irrelevant.

*Sixth charge.* The fourth specification under this charge in the information is that the respondent, in the presence of the court and of the grand jury, which was assembled to receive instructions and to attend to such business as the attorney general of the Territory might personally present to it (the matter to be presented being certain charges of cattle stealing against one Thompson and others), made a speech which the attorney general claims was intended to influence the grand jury and to induce it to find "no bill" against the said Thompson and his associates and the majority opinion is "that the language used was used for the definite purpose of preju-

dicing the grand jury and of leading the grand jurors to refuse to find a true bill against said Thompson." This is an assumption pure and simple, not supported by any testimony and evidently directly contrary to the impression produced upon the presiding judge who is presumed to be able to regulate the proceedings in his own court and to compel litigants, attorneys and others to confine themselves to language which is neither objectionable to the court, the jury or the spectators, and when a judge sanctions by his silence statements made in court the presumption is that they are not offensive nor intended for ulterior motives, and this judge having refrained from either rebuking Bevins or from suppressing his speech sanctioned the same by his silence; and it is not for this court at this time, ignorant of all of the circumstances except the stenographer's notes, to usurp the place of the trial judge and impose a sentence upon the respondent for an offense which it concludes was committed. Furthermore the statement of Bevins did not influence the grand jury as it returned "true bills" against the defendant.

I am further of the opinion that the charges contained in the information have not been supported by evidence and therefore the respondent should be exonerated.