*Thompson, Cathcart & Ulrich* for respondents.

---

IN THE MATTER OF O. P. SOARES, DISTRICT MAGISTRATE OF HONOLULU.

No. 1499.

ORIGINAL.

TRIED SEPTEMBER 21, 24, 25, 1923.      DECIDED OCTOBER 4, 1923.

PETERS, C. J., PERRY AND LINDSAY, JJ.

DISTRICT MAGISTRATES—*removal.*

Where a district magistrate as an attorney at law, with full knowledge of the facts, accepts and continues in an employment, the purpose of which is to consummate an illegal marriage and avoid criminal prosecution in a matter that might well come before him as district magistrate, his removal from office is deemed necessary for the public good.

OPINION OF THE COURT BY PETERS, C. J.
(Perry, J., dissenting.)

This is an original proceeding instituted by the attorney general on behalf of the Territory for the removal of O. P. Soares, Esquire, magistrate of the district of Honolulu.

On August 17, 1923, the following information was filed against the magistrate:

"That on or about the 4th day of June, 1923, the said O. P. Soares, at that time the duly appointed, qualified and acting first district magistrate of Honolulu, did accept employment by one Maria Constantina Freitas as her attorney for the purpose of procuring a divorce for said Maria Constantina Freitas from her husband, John Freitas, and did, on or about said date, accept a fee for said service, and did, on the 9th day of June, 1923, and pursuant to said employment, file in the division of domestic relations of the circuit court of the first judicial circuit a libel for divorce, in which the said Maria Constantina Freitas was named as libellant and the said John Freitas was named as libellee, and did on the 10th day of July, 1923, and pursuant to said employment, represent the said Maria Constantina Freitas at a hearing before the said division of domestic relations of the circuit court of the first judicial circuit of said libel for divorce, at all of said times having had good cause to believe that the libellee named in said libel had had sexual intercourse at various times with one Mary Freitas, a child of the age of about fourteen years, and the daughter of said Maria Constantina Freitas, and the stepdaughter of said John Freitas; that the said O. P. Soares accepted said employment, knowing full well at the time of said employment, and at all times thereafter, that the purpose for seeking said divorce for the said Maria Constantina Freitas was to enable the said John Freitas to marry his stepdaughter, the said Mary Freitas, and to avoid any possible criminal prosecution of the said John Freitas for having had sexual intercourse with the said Mary Freitas, and knowing full well that the matter of the prosecution of the said John Freitas might well come before the district magistrate of Honolulu for trial or committal, according to the charge."

On August 20, 1923, a show cause was issued directed to said magistrate to be and appear before this court at a time and place certain and show cause if any he had

why the prayer for his removal set forth in said information should not be granted.

On September 9 following the respondent filed the following return to said show cause:

"He admits that on or about the 4th day of June, 1923, he was the duly appointed, qualified and acting district magistrate of Honolulu; that on or about said date he did accept employment by one Maria Constantina Freitas as her attorney for the purpose of procuring a divorce for her from her husband, John Freitas, and that he did charge her a fee in the sum of $75.00 for his services, and did receive from her the sum of $15.00 on account of said fee; that he did on or about the 9th day of June, 1923, and pursuant to said employment, file or cause to be filed in the circuit court of the first judicial circuit, in the Territory of Hawaii, division of domestic relations, a libel for divorce in which the said Maria Constantina Freitas was named as libellant and the said John Freitas was named as libellee; that he did on or about the 10th day of July, 1923, pursuant to said employment represent the said Maria Constantina Freitas at a hearing upon said libel for divorce before the Honorable John R. Desha, Judge of the said court, division of domestic relations; and denies that at all of said times he had good cause to believe that said libellee had had sexual intercourse at various times with one Mary Freitas, a child of the age of about fourteen years, and the daughter of said Maria Constantina Freitas and the stepdaughter of said John Freitas; and admits that at the time that he accepted said employment and at all times thereafter he knew that the purpose for seeking the said divorce was to enable said John Freitas to marry his said stepdaughter, the said Mary Freitas; and denies that the time he accepted said employment or at any time thereafter that he knew that the purpose for seeking said divorce was to avoid any possible criminal prosecution of the said John Freitas for having had sexual intercourse with the said Mary Freitas; and denies that at the time he accepted said employment that he knew full well that the matter of the prosecution of said John Freitas might well come before the district

magistrate of Honolulu for trial or committal, according to the charge, or that said matter of the trial of John Freitas upon any criminal charge was considered by him or came into his mind at the time of his employment. And further answering said information, alleges that he accepted said employment in absolute good faith and in his capacity as an attorney-at-law, duly licensed and admitted to practice in all the courts of the Territory of Hawaii, and that all of his acts and doings in and concerning said employment were done bona fide and as an attorney-at-law, and that it was not until after he had accepted said employment and filed said libel for divorce that the matter of the age of said Mary Freitas was brought to his attention, and that the matter of there being any substantial grounds for believing that said Mary Freitas had had sexual intercourse with her stepfather were brought to his attention."

A hearing was had in open court upon the issues raised by the information and return and evidence both oral and documentary adduced by the respective parties.

By stipulation of counsel there was also made a part of the evidence the testimony taken before the judge of the division of domestic relations of the first circuit court upon the rehearing in the divorce proceedings of *Freitas* v. *Freitas,* Div. No. 8976, hereinafter referred to.

Section 2296, R. L. 1915, as amended by Act 108, S. L. 1919, provides:

"District magistrates shall hold office for the term of two years and until their successors are appointed and qualified; provided, however, that any magistrate may be summarily removed from office, and his commission revoked by the supreme court whenever said supreme court shall deem such removal necessary for the public good."

If as alleged in the information the respondent while magistrate accepted and continued in the employment referred to, knowing full well at the time of said employment that its purpose was to enable the stepfather to marry his stepdaughter then of the age of fourteen years

and to avoid any possible criminal prosecution of the stepfather for having had sexual intercourse with his stepdaughter and that the matter of the prosecution might well come before him for trial or committal, according to the charge, it is obvious that the incumbency of the magistracy of Honolulu has fallen into disrepute and that the respondent's removal is necessary for the public good.

It is the undisputed evidence that on June 9, 1923, Maria Constantina Freitas and John Freitas were husband and wife having been duly married on April 30, 1918;. that Mary Freitas is the daughter of Maria Constantina Freitas by a former husband and on October 1, 1923, was fifteen years of age; that on May 30, 1923, the mother accused her husband of improper relations with her daughter; that on Monday, June 4, 1923, the mother took her daughter to Dr. Gaspar, a physician practicing in Honolulu, for examination and such being had the mother was advised by the physician that her daughter was no longer a virgin; that thereupon the mother requested of Dr. Gaspar the name of some attorney whom she might consult and the doctor recommended the respondent, giving the mother a written memorandum of his name and office address; that the mother thereupon immediately went with her daughter to the office of the respondent and there consulted with him as an attorney at law; that at that time the respondent was an attorney at law licensed to practice in all the courts of the Territory and was and has since continued to be magistrate of the district of Honolulu; that at no time prior to June 4, 1923, had Maria Constantina Freitas sought to secure a divorce from her husband or consulted counsel in respect thereto; that respondent prepared and the said Maria Constantina Freitas signed and verified before the respondent as notary public a libel for divorce upon the ground of extreme cruelty, the allegations in that regard

being as follows: "That libellee has been guilty of extreme cruelty towards libellant in that without cause or provocation on divers and numerous occasions he has forcibly ejected libellant from her home causing her great bodily pain and suffering; that he has used vile epithets towards libellant and on divers and numerous occasions within three months last past accused libellant of infidelity and of violating her marriage vows; and that by reason of such conduct libellant has become greatly impaired in health;" that immediately prior to June 4, 1923, Mrs. Freitas and her husband were living together as husband and wife; that on June 4, 1923, the respondent sent a letter to John Freitas requesting him to call at the respondent's office, opening with the following paragraph: "Your wife and her daughter called upon me this morning and made *certain statements*. Before taking any action I shall like very much to discuss the matter with you;" that no reference was made in the letter to a divorce; that on June 5, 1923, respondent addressed another letter to John Freitas requesting him to call, enclosing a carbon copy of the letter to him of June 4; that John Freitas in response to said letters called at the office of the respondent, resulting on June 7 in John Freitas indorsing an admission of service upon the original summons in divorce and conveying to his wife through an intermediary in the employ of the respondent one-half of his property; that at the same time the husband was furnished by respondent with a memorandum reading "July 10, at 4 P. M.;" that July 10, 1923, was the earliest day upon which the libel if uncontested might be heard; that on June 6, 1923, the mother left her husband and advised her attorney of such action; that from June 6 to June 15 the daughter and stepfather occupied the home alone; that on June 15, 1923, an officer of the division of domestic relations of the circuit court of the first circuit took

the daughter from the stepfather's home and placed her and has since detained her in the government detention home for girls; that immediately after the removal of the daughter from the stepfather's home and on the same day both the mother and stepfather called at the respondent's office and complained of the publicity that had been given the relations of the stepdaughter and stepfather; that upon the occasion of these visits the respondent was advised by Mrs. Freitas that her daughter was then under fifteen years of age and by Mr. Freitas that the officer of the division of domestic relations who had taken his stepdaughter from his home had accused him of having, prior to June 4, 1923, had improper relations with his stepdaughter; that respondent thereupon advised John Freitas to secure counsel; that the libel for divorce brought by Mrs. Freitas was heard on July 10; that the libel was uncontested and the prayer thereof granted upon the uncorroborated evidence of the libellant; that prior to entry of decree, objection thereto having been made by the attorney general of the Territory, on July 20, 1923, a rehearing was had and after summoning the libellant and libellee, Mary Freitas and the respondent and after taking their evidence the court on August 1, 1923, held that the evidence given by the libellant upon the original trial was at variance with that given by her at the rehearing—that her evidence refuted the evidence she gave relative to the ground of extreme cruelty upon which the court had granted the divorce and dismissed the libel; that on July 26, 1923, the grand jury of the circuit court of the first judicial circuit returned into said court an indictment charging the said John Freitas with having at Honolulu on December 24, 1922, had sexual intercourse with one Mary Freitas, a female under the age of fifteen years, contrary to the provisions of section 4149, R. L. 1915.

There are but two matters upon which there is any conflict in the evidence, first, as to the extent of the respondent's knowledge on June 4, 1923, of the previous unlawful relations existing between John Freitas and his stepdaughter, and secondly, the purpose for which the divorce proceedings were instituted, as testified to by John Freitas.

First, as to the respondent's knowledge on June 4, 1923, of the previous unlawful relations existing between John Freitas and his stepdaughter.

The information lays the time of this knowledge as between the 4th of June, 1923, and the 10th of July following. The respondent as a witness on his own behalf admitted that on June 15, 1923, ten days after his employment and while the divorce proceedings were pending and undisposed of he was advised by the girl's mother that Mary Freitas would not be fifteen years of age until the 1st day of October following and that from the statement made to him by John Freitas he considered the charge made against the latter of previous improper relations with his stepdaughter sufficiently serious to require advice and protection of counsel. In the face of this information, however, the respondent continued in his employment by Maria Constantina Freitas in the divorce proceedings until finally determined. This in itself is sufficient to sustain the allegations of the information that respondent "at all the said times  *  *  * had good cause to believe that the libellee named in said libel had had sexual intercourse with one Mary Freitas, a child of the age of about fourteen years  *  *  * and knowing full well that the matter of the prosecution of the said John Freitas might well come before the district magistrate of Honolulu for trial or committal, according to the charge." So that the respondent's knowledge in this regard on June 4 preceding, is immaterial except so

far as his denial reflects his credibility and furnishes additional reason for his removal.

But we are convinced that not only on June 15, 1923, was the respondent aware of the previously existing unlawful relations between John Freitas and his stepdaughter and the age of the latter but that he also had such information on June 4, 1923, and that he accepted the employment with full knowledge thereof for the purpose of enabling John Freitas to marry his stepdaughter and thereby avoid any possible criminal prosecution of John Freitas for having had sexual intercourse with the said Mary Freitas.

Mrs. Freitas testified that she repeated to Judge Soares her accusation to her husband on May 30 previous and the latter's reply thereto that he had "tried;" that she told him that she had just come from her physician who had made an examination of her daughter and his report thereon; that she admitted to Judge Soares that she had no proof of her daughter's conduct but that he could question the girl alone and find out for himself and that Judge Soares questioned the girl alone and out of the presence of the mother. The daughter testified that she told Judge Soares that she had had sexual intercourse with her stepfather once while they were in the mountains and upon other occasions at home. The respondent as a witness on his own behalf met this evidence by stating that at the time of the mother's visit she was extremely agitated and could furnish him with no proof of any improper relations between her husband and daughter; that he questioned the girl and asked her if she had done anything wrong with her stepfather, to which the daughter replied that they had gone to the mountains together, from which he concluded that the girl by reason of youth and immaturity did not understand what he was talking about and that he elicited no information whatever from

her. In his letter, however, of June 4, addressed to John Freitas, respondent stated that the daughter had made a "statement." Moreover, he admitted that Mrs. Freitas had told him that she had accused her husband on May 30 previous of improper relations with her daughter; that she repeated to him the result of the doctor's examination; that the mother had told him that the daughter was very fond of her stepfather, showing an inclination to be with him in preference to the mother and that upon one occasion when the mother had desired her daughter to accompany her to town the daughter had refused so that she could remain at home to meet her stepfather upon his return from work. The statement of the mother unquestionably was sufficient to excite suspicion. We are satisfied that the daughter fully advised the respondent of the facts. As a witness before this court Mary Freitas gave her evidence in a clear, straightforward manner and answered readily all questions propounded to her touching her previous relations with her stepfather. These questions were couched in language of equal delicacy to that employed by the respondent when he questioned her. The girl showed intelligence, if not superior, at least equal to girls of her own age. John Freitas testified that when he demurred against conveying one-half of his property to his wife the respondent told him that if he refused, he (respondent) would have nothing further to do with the matter, in which event he (Freitas) would go to jail. The respondent testified that he attributed the overwrought and excitable condition of the mother to "temperament." He admitted, however, that he agreed with the mother that no reference should be made in the divorce proceedings to the relations of the stepdaughter and stepfather. The respondent's own admissions are sufficient to lead any reasonable person to believe that

he must have had a strong suspicion as to the previous conduct of the stepfather and stepdaughter. Coupled with the evidence of Mrs. Freitas and her daughter, which we have no reason to disbelieve, the conclusion is inevitable that the respondent on June 4, 1923, had sufficient facts before him to give him probable cause to believe that John Freitas had been guilty of sexual intercourse with his stepdaughter and that he was amenable to prosecution therefor, in the event of which a complaint charging such offense against John Freitas might come before the respondent as district magistrate. The seriousness of these illicit relations was also presented to the respondent. The mother testified that she told the respondent her daughter's age. The appearance of the girl would indicate to the casual observer that while a woman she was still of immature age. The respondent admitted that Mrs. Freitas told him that she wanted a divorce so that her husband could marry her daughter. The question of the girl's age would naturally present itself to the respondent's mind in view of the distinction made by the statute in sexual offenses, accordingly as the female is under or over the age of fifteen years, and in view of the fact that the law fixes the minimum age at which a female may enter into a marriage contract at fifteen years. Sexual intercourse with a female under the age of fifteen years is punishable by imprisonment for a period of from three to ten years. Marriage by a female under the age of fifteen years is prohibited by law.

Second, as to the purpose of the divorce.

There are certain features in connection with this employment that merit preliminary attention. Mrs. Freitas testified upon the rehearing that she told the respondent that it was not on account of her husband's ill treatment of her that she wanted a divorce but so that he could

marry her daughter; that she had never thought of want-
ing a divorce until her husband confessed to his im-
proper relations with the daughter on May 30, and that
Judge Soares promised her that just as soon as the
divorce was secured the stepfather could marry her
daughter. She reiterated this evidence in substance when
a witness before this court. The respondent admits that
he did not ask Mrs. Freitas for any details of the
alleged cruelty. He testified that he presumed she would
be able to sustain the allegations of the libel. No details
are alleged in the libel. The libel for divorce upon the
ground stated was apparently a subterfuge calculated
simply to bring about the desired result. A divorce was
granted upon the uncorroborated evidence of the libellant.
As admitted by the respondent she answered the usual
leading questions. She was not subjected to any cross-
examination and as is usual in such cases under such
circumstances the court granted the prayer of the libel.
Subsequently upon rehearing this order was vacated and
set aside and the libel dismissed for insufficiency of the
evidence. We can only conclude that there were no
grounds for a divorce in the first instance other than the
ground of adultery and that the ground of extreme
cruelty was employed purely and simply to secure a
divorce in order that Freitas might marry his step-
daughter.

The real purpose of the divorce, however, was not simply
to save the daughter from disgrace. It was also calculated
to avoid criminal prosecution. While none of the evidence
except that of John Freitas indicates that it was discussed
it was apparently equally persuasive in determining
to secure the divorce and have the girl marry her step-
father. Neither a husband nor wife, with certain quali-
fications not here applicable, is competent to testify
against the other in criminal cases. Marriage would have

sealed the lips of both parties. Apparently Mary Freitas was the only available witness willing to give or capable of giving any direct evidence as to the previous relations existing between her and her stepfather. Upon her marriage to John Freitas her lips would be forever sealed as to the facts within her knowledge touching her previous relations with him. And it was only due to the efforts of the division of domestic relations that this plan was not consummated. If the marriage were consummated immediately upon the securement of the divorce, until its annulment the daughter as the stepfather's wife would be incompetent to testify against him. If the marriage were delayed until October 1, when the daughter could legally marry her stepfather, the result would be equally effective. Under the statute no jury trials can be begun during the months of July and August. To defeat the purpose sought by the divorce the Territory had but the remaining half of June and the month of September within which to indict and prosecute John Freitas. With the usual delays attendant upon a criminal prosecution it was reasonably probable that October 1 would be reached and the girl married to the stepfather before a trial could be had. In his testimony before the judge of the division of domestic relations John Freitas testified to the following as having occurred upon his visit at the respondent's office in response to the latter's letter of June 5: "I went in and said 'My name is Freitas' and he said 'Sit down' and he told me about what my wife complained against me. He said 'Your daughter came here and said you did it to her a couple of times' and I didn't admit that I did anything to the girl. Afterwards he said, 'Being amongst us Portuguese, we will bring this quiet and the public don't have to know about it and everything be alright and after the divorce you can marry the girl.' " As to his visit on June 15 at the office

of the respondent he testified as follows: "After this I told him Judge Soares 'I am in a deuce of a fix. They can get a case against me now.' He said: 'What is the matter? They can't do anything' but here he got me— may be he got me, I don't know. Because he said he didn't want to change,—that the girl would be a month married before the jury would meet and the jury would do nothing until September coming or October. I am sure that is what he said. That the girl would be fifteen and I could get married and they could not do anything, and that is how I told." Upon the hearing before this court the witness John Freitas testified to like effect. This is denied by the respondent.

The same witness, John Freitas, testified that the respondent agreed to marry him to his stepdaughter and that the memorandum reading "July 10, at 4 P. M." was the time given him by respondent at which the divorce would have been granted and he and the stepdaughter might come before the respondent and be married. The respondent explained this memorandum by saying that it was a reminder to Freitas of the time at which he could call at the respondent's office and secure from him a certified copy of the decree of divorce.

Neither Mrs. Freitas nor her daughter was impeached. Their evidence is free of contradictions. One witness called on behalf of the respondent testified that upon the occasion of the rehearing in the case of *Freitas* v. *Freitas* before the judge of the division of domestic relations, Mr. Freitas was heard to say under his breath when the respondent took the stand, "You son of a ——," and while the respondent was testifying in respect to the division of property, "You son of a —— I'll get you yet," or words to that effect. The evidence of all three witnesses was the same as given upon the rehearing. We doubt not that both Mr. and Mrs. Freitas were and are incensed

at the respondent that their plans miscarried and their employment of the respondent did not as they hoped and planned protect the daughter from disgrace and avoid the criminal prosecution of the stepfather. But we fail to discern that it affected their evidence in any way. Their resentment is not sufficient to warrant us in disregarding their evidence. The undisputed evidence hereinbefore recited, together with the admissions of the respondent, is strongly corroborative of their testimony. The girl, Mary Freitas, told a straightforward story. She was not cross-examined by the respondent. The weight and credibility of the evidence lie with the witnesses for the Territory and not with the respondent. The respondent's explanation of his interview with Mary Freitas on June 4, his admitted acquiescence in the plan to keep the "suspected" previous relations between stepfather and stepdaughter secret and secure a divorce so that they might marry; his continuance in the employment after he was fully informed of the age of the girl and her previous relations with her stepfather; his insistence while a witness on the stand that he was not yet "convinced" that there had been improper relations in the face of his admission that he had made no effort to interview the officer of the court who had arrested the girl on June 15 or satisfy himself after June 15 of the truth of the charge does not incline us to cast aside the evidence of the Freitases and accept his statement as the only one worthy of belief.

It is true that the statutes of the Territory do not prohibit a district magistrate, who is an attorney at law, from practicing his profession and whatever criticism may be leveled against a district magistrate for taking divorce cases that do not involve violations of our criminal laws, an attorney at law who is a district magistrate is strictly within his rights in so doing. But where an attorney at law who is also a district magistrate is sought

to bring divorce proceedings, the obvious purpose of which is to avoid a criminal prosecution which might well come before him as district magistrate for trial or committal, his oath and the ethics of his high office demand that he refuse such employment. To accept it is an invitation to those who desire to avoid or stifle criminal prosecution to seek his employment collaterally as an attorney at law, thereby bringing the office of district magistrate into disrepute.

When questioned as to why on June 15, 1923, after he had been advised of the age of the girl and her previous relations with her stepfather, he did not withdraw from the divorce proceeding, the respondent replied that having accepted a retainer he was disqualified in any event and that he might just as well continue, the second district magistrate being available in the event of a criminal prosecution being instituted against John Freitas.

An analysis of this explanation shows its fallacy. In the first place his employment by Mrs. Freitas in the divorce proceeding did not disqualify him under the provisions of section 84 of the Organic Act from sitting as a committing magistrate upon a charge against John Freitas for sexual intercourse with Mary Freitas. Moreover, the availability of the second magistrate is not the test. If so then the magistrate may with impunity accept retainers from defendants in criminal cases and appear therein before the second district magistrate.

In the second place, even conceding respondent's ignorance of the facts on June 5, 1923, on June 15 following, according to his own admissions, he was fully advised and the impropriety of his continuing in an employment designed to avoid criminal prosecution must have been apparent to him, irrespective of whether John Freitas upon such criminal prosecution might be brought before him or the second district magistrate for committal or trial.

Perry, J., dissenting.

Some thirteen members of the bar testified to the good character and reputation of the respondent as an attorney and magistrate. Were this a criminal prosecution and were degrees of punishment provided for by the statute defining the offense evidence of good character and satisfactory administration of office might well be considered. Unfortunately, however, this is a proceeding for removal and but one punishment is prescribed. The legislature has provided no alternative. The statute prescribes removal in the event that it appears that the same be necessary for the public good.

The confidence of the public in the courts must be preserved. Without that confidence a court ceases to perform the functions for which it is designed. However excellent the prior reputation of the respondent we are confronted with the question whether his present dereliction has destroyed the effect of his previous good conduct and rendered his incumbency a derogatory influence.

Convinced as we are that all the material allegations of the information have been sustained by competent and satisfactory evidence we are impelled to the conclusion that the public good demands his removal. A judgment removing the respondent from the office of magistrate of the district of Honolulu and revoking his commission as such will be signed upon presentation.

*H. R. Hewitt,* First Deputy Attorney General, for the informant.

*C. S. Davis* and *J. Lightfoot* for respondent.

DISSENTING OPINION OF PERRY, J.

I respectfully dissent.

Passing for the moment other elements of the charge which will be later referred to, the mere fact that the respondent while district magistrate accepted employment as attorney for the libellant in a divorce case and

performed to the end the duties of that employment does not justify his removal from office and was not in anywise illegal. Our statutes do not prohibit a magistrate from accepting such employment or from acting in the capacity of attorney. The state of the statutes, on the contrary, is such that they may properly be said to permit and invite the acceptance of such employment. In the case of judges of the supreme and the circuit courts it is expressly provided (R. L. 1915, Sec. 2243) that they shall not "exercise the profession or employment of counsel or attorney-at-law or be engaged in the practice of law." There is no similar provision with reference to magistrates. In the case of the attorney-general and all of his deputies, it is expressly provided (R. L. 1915, Sec. 1431) that they shall not "be concerned as counsel or attorney for either party in any civil action depending upon the same state of facts." There is no similar provision with reference to district magistrates. The only inference deducible from these express provisions and from the silence of the statutes on the same subjects with reference to magistrates is that it was the intention of the legislature to leave magistrates at liberty to accept employment as attorneys at law. More than that, a bill was presented to the legislature at its session of 1923 (if my memory serves me well, similar bills have been presented at earlier sessions of the legislature) prohibiting magistrates from engaging in the practice of the law and requiring them, in other words, to devote the whole of their energies, their time and their attention to the performance of their judicial duties. But the legislature in its wisdom refused to pass this bill. It thereby affirmed that the inference deducible from its silence in the past was correct, namely, that it wished the men who were magistrates to be at liberty to supplement their official salaries by employment and compensation for their

services as attorneys at law. I am not defending that state of the law. I think it is a pernicious one, necessarily resulting at times in difficulties and incompatible with the highest independence and efficiency of magistrates; but that is the law, laid down by that branch of our government upon which alone rests the responsibility of determining what the law shall be. No blame, therefore, attaches to the respondent for accepting employment in a divorce suit or for performing to the end all of the duties of that employment to the best of his ability.

The case of *In re Bevins,* 26 Haw. 570, has no resemblance to that at bar. In that case the respondent was a county attorney and charged expressly by law with the duty of prosecuting persons charged with the commission of criminal offenses; and he was under the express inhibition already quoted against being "concerned as counsel or attorney for either party in any civil action depending upon the same state of facts." He was found guilty and suspended simply because he violated the express terms of the provision last quoted. While county attorney and while under the obligation to prosecute for the commission of crimes, he accepted from the complainants employment as their attorney to conduct civil proceedings in matters depending upon the same state of facts upon which criminal prosecutions could and should have been based. No parallel exists between those facts and the facts now immediately under consideration; nor is there any similarity in the state of the law or in the principles involved.

It is contended, however, in effect, that the respondent participated in and conducted a conspiracy to procure for his client, Mrs. Freitas, a divorce upon trumped-up and non-existing grounds. The grounds charged in the libel were, in substance, extreme cruelty, consisting of physical violence and false accusations against the chas-

tity of the libellant. The difficulty with this specification against the respondent is that it is not supported by any evidence in the case and that its truth is expressly negatived by the evidence of the wife and of her daughter. Mrs. Freitas not only testified that it was *her* wish, formed before' ever consulting the respondent, that the divorce should be procured upon the ground of cruelty and not upon the ground of adultery but also testified expressly and most clearly that all of the allegations of the libel concerning cruelty were true, that on one occasion her husband had struck her a blow, that on many occasions she had suffered at his hands a course of conduct which she termed "impertinences" (as translated by the interpreter) and that the husband had on several occasions by the use of physical force put her out of the house, "thrown her out of the house," "pushed her out of the house." Such conduct as this clearly constitutes extreme cruelty. Mary Freitas, daughter of Mrs. Freitas, stepdaughter of John Freitas and his accuser in the matter of the adultery, testified expressly that all that her mother told the respondent on the subject of extreme cruelty was true and that she herself had seen her stepfather strike her mother and with force put her out of the house and throw her down the stairs. These two are the only witnesses who have testified on the subject of extreme cruelty,—except Freitas, who denied in this court all acts of violence and whose lack of credibility is dealt with below. My only finding on this subject can be and is that there was no false charge of extreme cruelty and that there was no conspiracy to falsely charge such cruelty. After a trial directly on the point the judge of the court of domestic relations found that there had been no collusion between Mrs. Freitas and her husband looking towards the securing of a divorce by Mrs. Freitas.

Perry, J., dissenting.

It may be added at this point that in divorce cases the reliance by a libellant, man or woman, and counsel upon the lesser of two or more truthful charges against the libellee is not a novel thing. It frequently happens that, along with a possible charge of improper sexual relations, the facts justify a charge of desertion or cruelty or failure to provide and it often happens in such cases that the libellant and her attorney prefer not to mention the graver misconduct but to seek the divorce purely by reason of the commission of the lesser offense. Men of the highest standing at the bar have so chosen in the past and their choice as well as that of their clients is commendable. Whenever the lesser reason of the two suffices and requires a dissolution of the marriage tie according to the laws of the land, why should the graver charge be published broadcast and contested in public? What public or private good would be attained thereby? None whatever.

Again it is contended as a serious element of wrongdoing on the part of respondent, that in addition to conspiring to present a false libel to the court he undertook and conspired to perform a marriage ceremony which would make Freitas and his stepdaughter man and wife before the girl should attain the age of fifteen. The evidence of the respondent on the one hand and of the prosecution on the other hand is in direct conflict upon this point, the respondent denying that he ever entered into any such undertaking. Weighing the evidence of the witnesses, I believe the testimony of the respondent on this subject. He knew what the limits of age were which were prescribed by law in cases of marriage. I cannot believe that a man of his intelligence and ability and experience (he had served as agent to grant marriage licenses at one time in the past) could deliberately conspire to violate such a law as this,—and in a matter, too, of no materiality to him other than the recovery of a fee of $75.00 from a client

of doubtful ability to pay and who had paid only $6.00 on account. But beyond that, the witnesses for the prosecution in point of credibility have not impressed me favorably. The attitude and manner of Freitas on the stand were such as to indicate to me clearly that no reliance could be placed upon his testimony. He trembled most noticeably throughout the giving of all his testimony. A man of his age taking the stand with the sole purpose of telling the truth would have no cause for trembling. He is a man of mature age. Mr. Joseph Dias, interpreter in the courts for many years past, testified that at the rehearing of the divorce case before Judge Desha, Freitas, who was seated in the court room next to the witness, said, "You son of a b—— I'll get you yet," meaning the respondent who was then on the witness-stand. This Freitas denied while testifying before us. I believe the evidence of Mr. Dias. Freitas' manner on the witness-stand indicated to my mind a spirit of hatred and vindictiveness and a willingness to testify falsely and I believe that in many of his answers on material matters he perjured himself. I place no reliance upon his testimony. So also the attitude and manner of Mrs. Freitas on the stand did not impress me favorably. She is clearly of a very nervous, excitable temperament. Her story, as well as that of the girl, has evidently been told many times before officers of the government, before the attorney-general or his deputy, before Judge Desha, before inferior officers of the court of domestic relations, as well as finally before this court. The judge of the court of domestic relations, after a rehearing, judicially found that "the evidence given by the libellant in the original trial was at variance with that given by her at the rehearing" and that the evidence given by her at the rehearing "refuted the evidence she gave" at the first trial "relative to the ground of extreme cruelty." In other

words, the circuit judge found that she committed perjury in one of those proceedings. I cannot feel assured that she is not committing perjury now.

It was Mrs. Freitas' strong desire from the very beginning, formed by herself before she ever consulted the respondent, to secure a divorce and to have her husband marry his stepdaughter because, as she put it, the girl and the man seemed to care greatly for each other and because she did not want the girl disgraced. After Mrs. Freitas left her husband and refused to take her daughter with her, the daughter remained living in the same house with the stepfather in which all three had been living. The arrest of the girl, some time after the employment of the respondent as attorney, on the ground that she was living alone in the same house with her stepfather and probably in adultery with him, might have caused fear on the part of Mrs. Freitas that her program of a marriage of the daughter with the stepfather would be interfered with. There were consultations between her and her husband on the subject. She may have become suspicious that the respondent had caused the arrest of the girl or given information which led to her arrest. My own experience as a practicing attorney has taught me most emphatically that clients of the type of Freitas and his wife are often unduly suspicious of their attorneys and often misunderstand and misinterpret what their attorneys have said and make against them wholly unfounded accusations. Whatever her motives and however they arose, I cannot place any reliance upon her testimony to the effect that the respondent promised to perform the marriage ceremony on July 10, 1923, at 4 o'clock P. M. The respondent says that the little piece of paper which he handed to Freitas containing the words and figures "July 10, 1923, 4 o'clock P. M." was intended by him to be a memorandum of the time when Freitas could obtain from

him a certified copy of the decree of divorce and that it was given in answer to the request of Freitas for the "divorce papers." Upon this point the testimony of Freitas is that the respondent had told him that he, Freitas, would be married on July 10 and that he, Freitas, was afraid he might not be able to remember the date of his own marriage and that therefore he had asked for a memorandum of it in writing. When I am asked to base a most serious judgment against this respondent upon testimony of this nature I can only say that I cannot do so.

I bear in mind that all the time there must be hanging over the girl the thought that she is under the serious charge of having committed adultery with her stepfather. I bear in mind her natural desire to overcome that charge in the easiest way possible. It would not require a very great degree of imagination on her part to believe that if she tells a strong story against this respondent she may be more leniently dealt with by the authorities. Continued repetitions by her of this story and continued hearings by her of repetitions of the mother's narratives and of the stepfather's narratives on the same subject for months past may easily have created in her mind confusion as to the times when, the places where and the persons to whom this, that or the other statement of hers or of her mother's was made.

As opposed to the testimony of those three witnesses, susceptible of these and perhaps other weaknesses, is the testimony of the respondent. Thirteen members of the bar of this court, all men of high standing in this community and who cannot be deemed capable of any misstatements or exaggerations for the purpose of freeing the respondent, have testified unequivocally and with unanimity that the reputation of the respondent as a judge, as an attorney, and as a citizen is "of the very best," "excellent" and "above reproach;" that none of these have ever heard

any accusations or imputations against him in any capacity; that they have dealt with him as attorney in cases in which they were associated with him and in cases in which they were on opposite sides and that his dealings and conduct as an attorney were always exemplary. They have testified to practicing before him as magistrate, some in a few cases only, others with very great frequency, and all, whether they won or they lost, declared that his rulings and conduct have been characterized by fairness and legal ability. Evidence of this sort is admissible because it may properly influence the court trying the respondent in its determination of the credibility to be attached to his testimony upon the main issues. It influences me. I place reliance upon the testimony of the respondent. I do not believe that he ever promised or conspired to marry Freitas and his stepdaughter before she became of the age of fifteen, which is the minimum age permitted by law for a woman to marry, or that he knew prior to June 15 when the girl was arrested and placed in the detention home that she was less than fifteen years of age or that he conspired or intended to defeat the law relating to punishment of Freitas for the alleged adultery.

It is not shown by proof or contended that the respondent has habitually accepted employment in cases in other courts that would legally disqualify him from sitting, or render it advisable that he should not sit, on criminal cases arising out of the same or connected transactions. In the one transaction in question, whether he was disqualified or not, he has testified, and I believe him, that if a criminal prosecution had arisen in his court he would have asked the second magistrate to sit in his place. If the magistrate had, after serving as counsel in the way that he did, proceeded to sit as magistrate in a criminal cause in which Freitas—or perhaps the girl —was accused of crime, the accusation against the re-

spondent would be of a more serious nature; but this did not occur. The law provides for the appointment of two magistrates. Judging from the per diem pay provided for the second magistrate, his sittings were, it is true, intended by the law-makers to be occasional and temporary only and were not intended to permit the first magistrate to so indulge in practice as to require the government to pay per diems to the second magistrate which would not otherwise be required. But the wrong involved in the respondent's having this once caused this additional outlay to the government for the hearing, by the second magistrate instead of the first, of criminal proceedings against Freitas or the girl would not be a matter of any such degree of seriousness as to require or justify his removal from office. A simple caution or expression of disapproval, I am confident, would prevent a repetition of any such unnecessary outlay of money.

Much was said during the trial to the effect that the information gained by the respondent on June 15 (the day on which the girl was taken to the detention home) that the girl for two weeks had been living in the same house with Freitas and that, therefore, it was altogether likely that the suspicions of Mrs. Freitas communicated to the respondent on June 4 that there had been improper relations between Freitas and the girl were well founded, was sufficient to imperatively require the respondent to then withdraw as counsel in the divorce case. I am entirely satisfied with the respondent's answer to the question of one of the justices upon this point, to wit, that as to any criminal prosecution which might be instituted after June 15 the respondent was no more disqualified after that date than he was before that date. I say this in view of my finding that there was no conspiracy to obtain a divorce upon false grounds and no undertaking by the respondent to perform the marriage ceremony

before the girl should become of legal age for the purpose or to thwart the criminal laws.

The finding that on June 4 the respondent knew that there had been illicit intercourse between Freitas and the girl rests upon the testimony of Mrs. Freitas and that of the girl. Freitas, it is clear, gave no testimony on which that finding could be based. The wife herself testified repeatedly in different forms in this court that what she said to the respondent was that she merely *suspected* the existence of these relations and that she had no proof of it,—adding that the respondent could ask the girl questions on the subject. I regard the woman's evidence as entirely corroborating that of the respondent on this point, to wit, that all he learned from her was that she suspected but did not know of these relations. Mrs. Freitas herself testified before us that she told the respondent that the girl had once refused to accompany the witness to the bank and had staid at home. She also testified in answer to questions by me that in her first consultation with the respondent she wanted to give way to the girl because the girl seemed to want Freitas and not because the witness believed improper relations had occurred. The girl's evidence was to the effect that she informed the respondent not only that Dr. Gaspar had said that she was no longer a virgin but that it was true that improper relations had existed. But as I have already stated, I cannot place reliance upon the evidence of this girl or base upon her evidence alone the finding that it was Freitas who caused the loss of virginity or that she told this to the respondent. It is easily possible for this girl, after the variety of examinations which she has undergone, after the many statements that she has made to different persons including her mother and, doubtless, Freitas, with knowledge of the charge that hangs over her own head, and with the human instinct to shield her-

self as far as possible, to have either become confused as to the person to whom she made this, that or the other statement, or even to have deliberately misstated the facts. If the claims of the prosecution as to her actual relations with her stepfather are true, she cannot be regarded as a wholly innocent child, unversed in the ways of wickedness and crime. If those accusations are true, she was quite willing to deceive her own mother on the subject. She appears to be a bright, intelligent girl. It cannot be said that she followed her illicit course with Freitas without a realization of the grave wrong she was doing her own mother in supplanting her in the way that she did,— if she did do so.

If reliance upon the evidence of Freitas is well founded, then the finding must be that there never has been any illicit intercourse between the girl and Freitas and the whole foundation of this case falls to the ground, for Freitas testified in the most positive terms, not in one "Yes" or one "No" but in repeated and elaborate statements, that he never had intercourse with the girl, that he tried to get rid of her when the mother left the home, and that he allowed the girl to remain only because the mother slapped her three times in the face and refused to let the girl go with her. If this evidence is true, there is absolutely no case against the respondent. If it is not true, Freitas deliberately perjured himself on the subject; and if he did, how can I place any reliance upon any of his other material evidence? I cannot do so. He likewise deliberately committed perjury when he said that he had never struck his wife or thrown her down the stairs. His attitude and manner at the time of so testifying, as well as other circumstances, indicate this to my mind.

I find no cause for the removal of the respondent. The public good does not require it. On the contrary, I feel confident that the public good will continue to be well

served in the future as it has been in the past by his continuance in office.   That it has been so served in the past, the eloquent words of the many attorneys who testified amply show.